ZELLA TAYLOR v. GEORGE W. COBERLY, R. J. COBERLY, VAN E. COBERLY, J. H. COBERLY, MOLLIE WILSON, LENORA STOUT, JOHN STOUT, WILLIAM STOUT, MARY FRANCES WISE and I. L. WISE, Appellants.—38 S. W. (2d) 1055.

Division One, May 21, 1931.*

*NOTE: Opinion filed at October Term, 1930, on March 31, 1931; motion for rehearing filed; motion overruled at April Term, May 21, 1931.

*Kitt & Marshall* for appellants.

*Nolan M. Chapman, Don Chapman* and *Arthur J. Mellott* for respondent.

944

FERGUSON, C.—This is a suit in equity seeking a decree of the court declaring the plaintiff to be the adopted daughter, with all the rights incident thereto, of Walter W. Coberly and Lou Coberly, husband and wife, both deceased. Lou Coberly died, intestate and without issue, on the 6th day of December, 1917, and at the time of her death was the owner as tenant in common with her husband of an undivided interest in certain real property situate in Livingston County, Missouri. Walter W. Coberly died, intestate and without issue, on the 17th day of October, 1924, seized and possessed of personal property of an alleged value of $1,800 and certain real property situate in Livingston County, Missouri.

The defendants are the collateral heirs of the Coberlys. The petition alleges a contract of adoption as follows:

"That the mother of this plaintiff died at the time of her birth. That shortly after plaintiff's birth, when she was just a few weeks old, the father of this plaintiff placed her in the custody of Walter W. Coberly and Lou Coberly, husband and wife, who were childless and never had any children except this plaintiff by adoption. That

soon after plaintiff's father had placed her in the custody of Walter W. Coberly and Lou Coberly, he (John F. Miller) for and on behalf of plaintiff made a contract and agreement with said Walter W. Coberly and Lou Coberly, for and on behalf of the plaintiff, that said plaintiff would remain with said Walter W. Coberly and Lou Coberly, and that they should have the absolute and exclusive control and custody of and would adopt plaintiff as their child and would raise plaintiff as their very own child; that they would make plaintiff their heir and the plaintiff would inherit and should have all their property at their death.''

Continuing, the petition states in detail the circumstances under which the plaintiff was taken into and lived in the Coberly home and which characterized the attitude and the relationship of the Coberlys toward her; that plaintiff fully complied with all the terms of the contract made in her behalf, ''rendering to said Walter W. and Lou Coberly during their lifetime all the love and affection, service and obedience of a daughter and living under the belief she was the adopted child of said Walter W. Coberly and Lou Coberly and that she would inherit and receive all their property at their deaths;'' and that the defendants make claim to the property of the Coberlys as heirs at law.

The prayer of the petition is, in substance, that the plaintiff be declared to be the adopted child of Walter W. and Lou Coberly, deceased, and that the title and right to the property and estate of the said deceased adopting parents be vested in her.

Answering, the defendants denied generally the allegations of the petition; aver that ''said pretended contract is within the Statute of Frauds'' and void, and ''that plaintiff has wholly failed to perform on her part the pretended contract declared on.''

The judgment and the decree of the court was for plaintiff, and defendants appealed.

The evidence is voluminous, being a record of many circumstances, incidents, statements and conversations during a period of more than thirty years, but we undertake to summarize the testimony in as brief a manner as seems consistent with a proper correlation of the facts.

In 1892 John F. Miller and his wife, Frances Miller, resided near Jamesport, Missouri. They were very poor, owned no property, their home a little cabin and a rented farm. They were the parents of four small children and this number was increased, when on December 3, 1892, twin girls were born. The twin babies were named Zella and Zula. Some two weeks later the mother died. Zella is the plaintiff herein. The father was unable to provide and care for the six motherless children, and they were taken to the near-by home of his father-in-law, Jeff Tye. It was necessary to find homes for these

children, and an aunt, a maiden sister of the deceased, took Zula. Zella was given to the Coberlys under circumstances which we shall presently relate, while the other children were placed with relatives.

Walter W. Coberly and his wife Lou Coberly owned and resided on a farm of about 120 acres some two miles distant from the Tye home. They were middle-aged, childless, fond of children, wanted to take a child into their home to rear as their "own child" and had made inquiries concerning homeless children with that purpose in mind. Learning of the Miller children they became interested in Zella, and the matter of taking her into their home was discussed with her father. It seems that Miller first insisted that he did not want to relinquish the child and that he would pay the Coberlys $2.50 a week and furnish her clothing if the Coberlys would take Zella into their home and care for her. It is apparent that the Coberlys, from the beginning, wanted to take exclusive charge of the child and rear her as their own child. Some two or three weeks after the child had been taken to the Tye home, Mr. and Mrs. Coberly went to get the baby and spent the day with the Tye family. On that occasion Zella's grandfather, two aunts, an uncle and his wife and the Coberlys were present and there was a general discussion among them about the Coberlys taking the baby; Miller was not present. At that time Mrs. Coberly stated in the presence of Mr. Coberly that she "would take the child if Mr. Miller would give her to them as their very own and she would not take her any other way," and "if Mr. Miller would adopt the child to them she would take the child as her own." That day the Coberlys took the child to their home and from that time their home became her home and they at once gave her the name of Coberly, by which name she was always known until her marriage.

John Miller, Zella's natural father, testified in this case by deposition. He died before the trial and twenty days after the taking of the deposition. He had not been in the vicinity of the Coberly home, except at very short intervals, during the years that had passed since Zella, at the age of five or six weeks, had been taken by the Coberlys, and had seen Zella but a few times. He resided in Kansas at the time of his death, and it is apparent that he was a very illiterate man, and the evidence shows that at the time of the taking of his deposition he was ill and had been for some time. He testified that he at first paid the Coberlys, as he had stipulated and insisted, at the rate of $2.50 a week for about three weeks; but he was not earning anything, had no property and could not take care of his children, and his testimony is then as follows:

"Q. Mr. Miller, did you make some further arrangements with Mrs. Coberly and Mr. Walter Coberly about your daughter Zella staying with them? A. Oh, yes, yes.

"Q. All right, just state what further arrangements you made with them. A. I left the child there' and I knew they got attached to it, and I told them they would have to keep it or I will take it away; and they took the child as one of their own, as their own child; and they said after they was gone Zella got everything.

"Q. Was that agreement made with both Walter Coberly and Lou Coberly, his wife? A. Yes, sir.

"Q. At the time you made the arrangement that you have just stated, Mr. Miller, was Walter Coberly and Lou Coberly his wife, present? A. Yes.

"Q. Mr. Miller, how long did your daughter remain with Walter Coberly and Lou Coberly, his wife? A. Well, ever since she was three or four or five weeks old, until she married. I don't know how long that was. I don't know what time she did marry, because I don't go about very much; I could not; I could not.

"Q. Did you ever visit with your daughter at the home of Walter Coberly and Lou Coberly after that? A. Why, once in a while, but not very often.

"Q. Do you know what name she was known by after that? A. Zella Coberly."

Miller never afterwards contributed anything to the support of the child, nor exercised or attempted to exercise any control over or make any claims upon her, and by his subsequent conduct entirely relinquished the charge, control and services of the child to the Coberlys.

Neighbors recalled and testified that both the Coberlys manifested and expressed happiness and joy in having a baby "of their own," fondled the tiny baby girl, exhibited her with pride, spoke of her as "our baby" and "my baby" and in terms of endearment. They taught her to call them "mamma" and "papa" and she always so spoke of them, except as some of the witnesses testified, "when she got to be a big girl, it was 'Dad' with Mr. Coberly."

When Zella was five years of age the Coberlys placed her in school. They listed her with the school enumerator as their daughter Zella and the enumeration lists and teachers' registers for eleven years from 1899 to 1909 inclusive, show that she was enumerated and her name carried on the school records as Zella Coberly, daughter of Walter W. and Lou Coberly. Only two times in the years does the Miller name, as applied to Zella, come into the record—when the little girl just past five years was sent for the first time to school, a young lady teacher, knowing something of Zella's history and that the name of her natural father was Miller, enrolled her as Zella Miller. The little five-year-old girl went home in tears to the only parents she knew and when they inquired the cause of the tears little Zella said: "Teacher called me Zella Miller" and with-

out delay Mrs. Coberly went to see the teacher and told her Zella's name was Zella Coberly, and she wanted her so known and enrolled. The other incident occurred at the time of Zella's marriage and will be hereinafter referred to. The Coberlys lavished affection upon Zella and she was affectionate toward them. She would sit on Mr. Coberly's knee with her arms about his neck and he would greet her with a kiss and speak to and of her in most endearing terms, and Mrs. Coberly was overly indulgent, kind and affectionate toward her. Nor is there any question made that during these girl-hood years she was a dutiful, obedient and loving child to them. The Coberlys purchased an organ for her and she took music lessons; they expressed a desire to send her away for more schooling when she finished the district school "if she would go;" she was allowed to give "parties" for her school mates and friends and witnesses stated that the Coberlys dressed her "nicer than any little girl in the neighborhood was dressed." She was known among her school mates and associates, and in fact by all who knew her, as Zella Coberly. The record is replete with expressions commonly and re-peatedly used by the Coberlys in speaking to, of and about Zella as "our child," "our girl," "our little adopted daughter," "our adopted daughter," and as "sweetheart," "darling," "honey," and "my dear." While Zella was yet a baby and during her girlhood and teen-age years the Coberlys stated at various time to friends and neighbors that: "What they had would go to Zella—would be hers," "some day the place would be hers," and Mrs. Coberly would say "the child belonged to them and she intended for Zella to have what she had." As the years passed Zella was held out and treated by the Coberlys and received and considered in the neighborhood as their child. When Zella was seventeen years of age, Frank Taylor, an unobjectionable young man, who lived with his father on a farm about three miles from the Coberlys, began to pay her court. They plighted their troth and Frank appealed to Mr. Coberly for his consent to the marriage. Mr. Coberly said: "I reckon it is all right with me, but you will have to see Lou," and they went to-gether, Mr. Coberly, Zella and Frank to Mrs. Coberly, who gave her consent to the marriage "if Frank would promise to be good to Zella and not take her too far away from us." In making plans for the wedding Mr. Coberly expressed an opinion that the license would have to be issued in the name of Zella Miller "because she hasn't been legally adopted" and it "might not be legal if she was married under any other name" and when "Zella cried about it," Mr. Coberly said: "Well, we will take you over and have you adopted," whereupon Frank said: "It don't make any difference what your name is when you get married because you are going to have my name in a few days." Frank and Mr. Coberly went for the mar-

riage license and we quote from Frank's testimony as to what occurred. "We went to the court house and I applied for the license and gave the clerk my name and age and her name as Zella Miller, and age seventeen. I told the woman there, the clerk, 'this is her father, Mr. Coberly' and she looked at him a minute and he says: 'That is all right.' Q. You said that? A. Walter, her father. 'That is all right,' he says; 'I and my wife took this girl to raise when she was a baby two weeks old as our own and I have got a right to give my consent to her marriage.' She went ahead and made out the license for us." They were married the next day, November 10, 1909. Zella would be eighteen years of age on December 3rd. Following their marriage they went to the Coberly home where a "wedding dinner" awaited them. Frank's father and family had moved to Chicago, and Frank and Zella had arranged to live at the Taylor farm, to which they moved from the Coberly home within a few days. Mr. and Mrs. Coberly gave them a cow, chickens, dishes, canned fruit and numerous other useful articles, and one neighbor testified that Mrs. Coberly was thereafter "all the time buying something to put in Zella's house and saying: 'This is for Zella,' and 'That is for Zella.'" After Zella and Frank moved to the Taylor farm they visited the Coberly home "two or three time a week" and Frank Taylor says: "After my wife got away from home, she wanted to be going home all the time," and Mr. and Mrs. Coberly went frequently to the Taylor home. A child was to be born to Zella and Frank and Mrs. Coberly's visits increased in frequency. She helped Zella with her housework and did her washing and ironing. The event neared and Zella was taken to the Coberly home where on August 10, 1910, a baby boy was born and named Walter William, after his grandfathers Walter Coberly and William Taylor. Mr. and Mrs. Coberly both manifested joy and pride in their "grandson," as they spoke of the baby. When Zella and the baby returned to their home on the Taylor farm Mr. and Mrs. Coberly's visits became more and more frequent. In the Spring of 1911 Mr. Coberly proposed that Frank and Zella move to the Coberly farm and live with them; that Frank bring his stock there and farm the Coberly land, and at the time said: "If you don't move over there, I am going to wear my old mares out going back and forth." There was a crop failure and late in 1911 the Taylors went to Chicago, where Frank secured employment as a fireman on the railroad. Mr. Coberly kept Frank's live stock and looked after it. A regular correspondence was carried on with the Coberlys and about the first of April, 1912, the Taylor family returned to the Coberly farm "because her (Zella's) father and mother wanted us to come back," and Frank farmed the Coberly land that season. In 1912, while they were living at the Coberly home, a second boy

was born. In the Spring of 1913, additional pasturage being needed, the Taylors moved to the Taylor farm, which was used for pasturage and Frank farmed some of the Taylor land and a nearby tract which he rented. Early in October, 1913, the Taylors had a public sale, sold their live stock and other personal property, and moved to Ogden, Utah, where Frank had secured employment in a copper smelter. The testimony indicates that the Coberlys were very fond of Frank Taylor and that the relationship between the Coberlys and "their son-in-law" was at all times pleasant and friendly. They always spoke of him as their son-in-law, referred to Frank and Zella as their children, and to the Taylor children as their grandchildren, though Mr. Coberly often spoke of the Taylor children as "my boys." The Coberlys were unhappy at being separated from the Taylor family, Mrs. Coberly grieved, and Mr. Coberly complained about the children living so far from them; but on Thanksgiving Day a happy reunion of the two families' was celebrated in the Taylor home in Utah. The Coberlys had sold their live stock and followed the Taylors to Utah because Mrs. Coberly "wanted to see and be near her girl" and "wouldn't be contented any where else" and they both "wanted to be near Zella and the boys." They lived in the Taylor home at Ogden until about September, 1915, when they returned to Missouri for a visit, where they remained until the Spring of 1916, returning then to Utah to join the Taylors, who had, in the meantime, moved to Garfield, Utah, where Frank was employed. The Coberlys lived in the Taylor home at Garfield for "six or eight months" and then moved to a rented house near the Taylor home. Mrs. Coberly became ill, was taken to a hospital and operated on for cancer. Improvement being noted she was taken to the Taylor home, where Zella could nurse and care for her. After a "month or so" Mrs. Coberly returned to her own home nearby and Zella went there daily and did the housework and cared for her mother. Mrs. Coberly suffered a relapse, was again taken to the hospital, and, no improvement being apparent, Mr. Coberly took her to Kansas City, Missouri, for treatment. Mrs. Coberly became seriously ill, death was impending, she was taken to Lock Springs, Missouri, and Mr. Coberly notified Zella, saying: "I am going to have Zella come and take care of her mother." This was about the first of December, 1917. Zella came to her mother and remained in almost constant attendance upon her until her death on December 6, 1917.

The testimony is that as Mrs. Coberly realized death was imminent she called for Zella, saying she "wanted to see Zella;" that she "wanted her girl near," and when Zella arrived she said: "Now I can die in peace." Mrs. Coberly was buried at Lock Springs, Missouri, and Mr. Coberly and Zella returned to the Taylor home in

Utah. After the death of Mrs. Coberly, Mr. Coberly executed a will at Lock Springs. This will has never been produced, its whereabouts discovered or its disappearance explained. One of the attesting witnesses, a physician residing at Lock Springs, who had attended Mrs. Coberly during her last illness after she had been brought to Lock Springs, testified that he was present at the making of the will, heard it read, saw Mr. Coberly sign it and thereupon signed as an attesting witness. In response to a question as to what disposition Coberly attempted to make of his property, the witness stated: "The best I remember, it was stated in this way: that his debts were to be paid and his estate was to go to Mrs. Taylor in her lifetime and then revert back to her children." Another witness testified that Mr. Coberly told him about November, 1923, that he had made a will and "that he was leaving everything to Zella and at her death to her children."

Returning to Utah with Zella in 1917 after the death of Mrs. Coberly, Mr. Coberly lived in the Taylor home there until January, 1919, when he returned to Missouri. He wanted to return to the Missouri farm, but wanted the Taylor family to come back with him and live with him on the farm. Frank told Mr. Coberly that he had "a pretty good job, paying a little more than $200 a month, and did not feel like giving it up." Mr. Coberly insisted and said: "Everything is fixed—everything is left to Zella and the boys at my death." It was arranged that the Taylors would later join Mr. Coberly and live with him on the Missouri farm, and in March following Mr. Coberly's return to Missouri in January, 1919, Zella and the two boys came to Missouri. The Coberly farm had been leased and immediate possession could not be obtained. Mr. Coberly rented a three-room house and a small tract of land, where he, Zella and the boys lived. Frank Taylor testified: "He (Coberly) said they could raise a nice bunch of chickens and they could get a cow and raise a garden and put up fruit, which they did, and be ready to take over the home place and go right on farming and have a little income coming in." In the fall of 1919 Frank, who had continued to work in Utah, returned to Missouri and they moved onto the home farm.

During the years 1920-21-22 and until February 19, 1923, Mr. Coberly and the Taylor family lived on the Coberly farm. Mr. Coberly's health failed late in 1922, and he was in a hospital at Jamesport, Missouri, for awhile. In December, 1922, Frank went to Kansas City, where he obtained employment in an oil refinery at good wages, and Zella, the boys and Mr. Coberly joined him there in 1923, where they lived together. Mr. Coberly made an occasional trip to the farm in Livingston County, which had been leased, and in December, 1923, went to Oklahoma to visit a brother and two

sisters (who are defendants herein), and hoping for an improvement in his health. He stated upon leaving that "he would be back home in the Spring," but his absence was extended while he visited several relatives in Oklahoma. On September 9, 1924, he wrote a letter to the Taylors beginning "Dear Zella, Frank and Kids" and concluding "To one and all I am coming home before long," and signed "Your Dad, W. W. Coberly;" but, on October 17th following, he died very suddenly at the home of his brother in Beaver, Oklahoma, and the following telegram was immediately sent by the brother, G. W. Coberly, one of the defendants herein, to Mrs. Taylor at Kansas City: "Your father died here. Heart trouble. Answer." Mr. and Mrs. Taylor replied by telegram advising that the body be sent to Lock Springs, Missouri, and that they would be there and arrange for the funeral and burial, which they did.

From the hour when as a baby but a few weeks of age Zella had been taken into their home until their death, her life had been inseparably linked and interwoven in the lives of her foster parents in a relationship marked by all the characteristics of parents and child. Frequently during the last years of his life and after his wife's death Mr. Coberly stated that "Zella was going to get his farm." In Utah and in Kansas City he had introduced and spoken of Zella always as his daughter, Frank as his son-in-law, and the children as his grandchildren and his boys. He was very fond of his grandchildren, would buy them toys and candies, make them kites, and liked to have them with him, and while living in Kansas City bought a paper route for the oldest boy, his namesake, paying $50 therefor.

At the time Zella was taken into the Coberly home and during the time her adoption is alleged to have been, in equity, consummated, the statutory method of adoption in this State was by a deed of adoption. No deed of adoption or writing agreeing to adopt was ever executed by the Coberlys. Appellants assert that the contract to adopt relied on, being an oral contract, is within the Statute of Frauds, void and wholly unenforceable, and cite the language in Barnett v. Clark (Mo. Sup.), 252 S. W. 625, 1. c. 628, that "such a contract is void under the Statute of Frauds." But, it is not necessary to undertake a discussion of whether the Statute of Frauds applies and is an absolute bar to the enforcement of a parol contract to adopt, as it has been ruled "from the case of Lynn v. Hockaday to recent cases on that subject" that under proper circumstances such contract will be recognized and enforced in equity. [Johnson v. Antry (Mo. Sup.), 5 S. W. (2d) 405.] We quote from Lynn v. Hockaday, 162 Mo. 111, 61 S. W. 885: "But since the statute has made the adoption of a child lawful, the law, for the same

reasons that it sometimes enforces oral contracts affecting real estate, will not allow the mere failure of one party to do his duty to work an irreparable wrong to one who has fully performed his part. This court, for that reason, has not only held an oral contract for adoption valid, but has also required fulfillment of a collateral agreement of the adopting parent, to leave the adopted child his estate at his death.''

And, in Barnett v. Clark, relied upon by appellants, it is said: ''Courts of equity do grant relief in the face of this statute.'' It is well settled in the jurisprudence of this State that a court of equity has jurisdiction to enforce a parol contract of adoption and decree the child to be an adopted child and an heir of the adopting parents where the contract has been fully performed by the child and it would be inequitable to deny adoption. [Lynn v. Hockaday, supra; Grantham v. Gossett, 182 Mo. 651, 81 S. W. 895; Signaigo v. Signaigo (Mo. Sup.), 205 S. W. 23; Barnett v. Clark, supra; Kerr v. Smiley (Mo. Sup.), 239 S. W. 501; Dillman v. Davison (Mo. Sup.), 239 S. W. 505; Remmers v. Remmers (Mo. Sup.), 239 S. W. 509; Craddock v. Jackson (Mo. Sup.), 223 S. W. 924; Fishback v. Prock, 311 Mo. 494, 279 S. W. 38; Johnson v. Antry, supra; Carlin v. Bacon (Mo. Sup.), 16 S. W. (2d) 46.] The evidence conclusively shows that plaintiff's natural father performed the alleged contract on his part by entirely relinquishing and surrendering the control, custody and services of the child to the Coberlys. That the contract was fully performed by the child cannot, under the evidence in this case, be questioned, and it was performed by the Coberlys with the exception that they failed to comply with the statutory provision relating to adoption. [See Fisher v. Davidson, 271 Mo. 195, 205, 195 S. W. l. c. 1026.] That plaintiff took the place of an only child in the lives of Mr. and Mrs. Coberly and performed her part as such constitutes a sufficient consideration to support the contract. ''How much she added to their happiness the law does not undertake to estimate. . . . Like a bud that has been cut from its natural stem and grafted into a foreign tree, she grew into the family and became a part of its very life. Everything that adoption contemplates was accomplished. It became a contract fully performed on her part and the Statute of Frauds cannot be invoked to her injury.'' [Lynn v. Hockaday, supra.]

Appellants challenged the competency of John F. Miller as a witness for respondent and urge here that he was incompetent because he was a party to the contract in issue and the other parties, the Coberlys, are dead. Upon a similar state of facts this identical question was raised in Signaigo v. Signaigo (Mo. Sup.), 205 S. W. 23, which was a suit, relating to title to real estate, between an alleged adopted

daughter and the collateral heirs of deceased adopting parents wherein a decree of adoption was entered, and it was held by this Court en Banc, that the natural mother of the alleged adopted daughter was competent to testify as to the parol agreement or contract of adoption. The question appellants made as to Miller's competency is fully discussed, reasoned and disposed of in the Signaigo case and upon authority of that case the assignment is ruled against appellants. [See Craddock v. Jackson (Mo. Sup.), 223 S. W. 924, 926.]

It is contended that a contract to adopt was not sufficiently proved and established and that the evidence does not adequately meet the test prescribed in this class of cases, i. e. to sustain the alleged oral contract the proof must be so clear, cogent and convincing as to leave no reasonable doubt in the mind of the chancellor. [Kay v. Niehaus, 298 Mo. 201, 249 S. W. 625; Lamb v. Feehan (Mo. Sup.), 276 S. W. 71; Johnson v. Antry, supra; Barnett v. Clark, supra; Grantham v. Gossett, supra.] In this case we think it was shown by cogent and satisfactory evidence, as measured by the foregoing rule, that a contract to adopt existed and that same was fully performed, as we have said, on the part of both the natural father and the child, and that therefore plaintiff was entitled to have a decree in a court of equity declaring her to be the adopted child and an heir of the deceased adopting parents.

The testimony of the natural father was taken thirty-three years after he delivered and resigned the complete control, care and custody of the child to Mr. and Mrs. Coberly under an arrangement or agreement with them to which he testifies. In response to a question as to what arrangement he at that time made with the Coberlys he said: "I left the child there and told them they would have to keep it or I would take it away, and they took the child as their own child and said that after they were gone Zella got everything." It is strenuously urged that the statement "they took the child as their own child" is a mere conclusion or opinion and has no probative value and standing alone it should perhaps be so taken, but viewed in the light of the immediate and surrounding circumstances attending the event we think it should be interpreted as an expression of what the understanding between the parties as to the future status of the child undoubtedly was. The Coberlys were childless, and wanted to take a child into their home "as their own child." On the day they went to the Tye home to get the baby, then but a few weeks old, there was a discussion between them and the baby's grandfather, aunts, an uncle and other relatives about the Coberlys taking the baby; and Mrs. Coberly, then in the presence and hearing of Mr. Coberly, stated that she "would take the child if Mr. Miller

would give her. to *them* as *their* very own, and she would not take her any other way;'' and ''if Mr. Miller would adopt the child *to them* she would take the child as her own.''

By reference to the statement of facts heretofore made, which facts and circumstances are uncontradicted, we think it will appear that the circumstances existing and the statements made by the Coberlys, at and near the time they took the baby, concur in establishing that the Coberlys took the child with the understanding, pursuant to an agreement, and upon the condition, that they should have exclusive control over and rear her as their own child. The subsequent history of the relationship which thus had its beginning, the acts, words, conduct and attitude of the Coberlys and the child are referable to no other relationship of which we can conceive than that of parent and child and are in full accord with and strongly indicative of the initial agreement that is alleged to have existed, to-wit, that they would take the child and rear her as their own child. In discussing the evidence in an equitable adoption case, Martin v. Martin, 250 Mo. 539, 548, 157 S. W. 575, 578, the court uses this language: ''The life of this family, living together under one roof, working together to all appearances for a common end, addressing one another in language of the hearthstone, expressive of filial ties and the filial affections; all these things, as was said by Judge Valliant for this court in Lynn v. Hockaday, 162 Mo. 111, 124, speak louder than words 'and these acts testify to what the agreement was more surely than witnesses who attempt to repeat the substance of conversations which they listened to twenty years before.' ''

It is not necessary that the precise word or term ''adopt'' should be used in expressing the purpose and intention of the parties. A contract is sufficiently phrased when it is expressed in plain language, understood by the parties making it. In Remmers v. Remmers, supra, the language accredited to the alleged adopting parents was that ''they wanted to take him as their own and raise him as their own'' and ''take him as their own child'' and this court said ''the foregoing testimony is sufficient to establish an agreement to take the plaintiff and make him as one of Remmers' own children,—in other words, to adopt him. Such is the effect of the agreement shown.''

In Fisher v. Davidson, 271 Mo. 195, 195 S. W. 1024, the testimony was that at the age of three years plaintiff was placed by her grandparents with Dr. and Mrs. Davidson who took her into their home and that Dr. Davidson ''was to take her as his child'' and ''they were to take her and treat her as their own child.'' It is said: ''The grandparents performed their part of the Kansas agreement by delivering plaintiff to the Davidsons, and exercising no control over

her thereafter. The Davidsons performed a part of their agreement, at least, by changing plaintiff's name to that of Davidson, and by introducing her to all their acquaintances as their daughter or adopted daughter, and treating her accordingly. The plaintiff carried out her part of the agreement made in her behalf, by living with the Davidsons as their child until her marriage in 1904, and performing such services as a natural child would have performed under the circumstances. She continued to treat them as her father and mother until their respective deaths." And, after a review of the evidence the court says: "We are thoroughly satisfied from the evidence that Davidson and his wife agreed with the grandparents of plaintiff to take and raise the latter as their own child," and it is held that the plaintiff was entitled to have a decree declaring her to be the adopted child of Dr. and Mrs. Davidson, both deceased.

It is plainly evident that the Coberlys at the time they took the baby, in expressing their purpose and intention in reference to her future status intended to be understood and were understood by Miller and the child's relatives as meaning that they were taking the child to be their own child by adoption. The circumstances and the language used refute the idea that they took the child into their home solely for her services and confirm the contention that she was taken as a member of the family and to be their own child. [Martin v. Martin, supra; Lynn v. Hockaday, supra.] If the view be taken that an express contract was not sufficiently made out, then, under the evidence here, we would be impelled to infer from the acts, conduct and admissions of the Coberlys that a previous oral contract to adopt plaintiff must have existed and that it was on the faith of that agreement the child was given to and taken by them. [Kay v. Niehaus, 298 Mo. 201, 249 S. W. 625, and cases there cited; Roberts v. Roberts, 223 Fed. 775.] The doctrine which Holloway v. Jones (Mo. Sup.), 246 S. W. 587, seems to announce is briefly stated in Shelp v. Mercantile Trust Co. (Mo. Sup.), 15 S. W. (2d) 818, as follows: "Where one takes a child into his home *as his own,* thereby voluntarily assuming the *status of parent,* and by reason thereof obtains from the child the love, affection, companionship and services which ordinarily accrue to a parent, he" or those claiming through him will thereafter be "estopped to assert that he did not adopt the child in the manner provided by law." If that doctrine be applied to the facts in this case clearly the plaintiff would be entitled to a decree declaring her to be an adopted child of the Coberlys.

The judgment and decree of the court *nisi* is affirmed. *Seddon* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All of the judges concur.