# WILHELMINA KAY v. FRANK H. NIEHAUS, JR., and EMIL NIEHAUS, Appellants.

## Division One, April 6, 1923.

1. **CHILDREN: Oral Agreement of Adoption: Character of Proof.** To establish an oral agreement to adopt a child made by deceased parties, the proof must be clear, cogent, and so convincing as to leave no reasonable doubt that the particular contract alleged was made; but the contract may be shown by the acts, conduct and proven admissions of the adopting parents, from which the agreement may be found as an inference, although there may be no direct proof of the agreement.

2. ——: ——: ——: **Facts Showing Admission.** A written contract of apprenticeship of a thirteen-year-old girl until she was eighteen is in evidence, and the conduct of the parties of the first part is inconsistent with that contract, in that they agreed to send her to public schools, but is consistent with a contract of adoption in that they sent her to a parochial school until she was confirmed by the Catholic Church. The adopting parties being dead, and the child being therefore incompetent to testify, the testimony of numerous witnesses, showing repeated statements by the adopting parents made in the presence of the adopted child, and some of them made in the presence of their two natural sons, the defendants, is set out at length, and *held*, that it thoroughly shows such admissions as justify an inference of a previous contract to adopt, although such contract was oral and is not otherwise in evidence.

Appeal from St. Louis City Circuit Court.—*Hon. George H. Shields,* Judge.

AFFIRMED.

*Lubke & Lubke* for appellants.

(1) The evidence does not warrant a finding and decree that plaintiff was agreed to be adopted as their child by Frank H. Niehaus and his first wife. No witness testified to any contract between them and the mother of plaintiff, or between them and the plaintiff. To sustain an alleged oral contract to adopt a child, the proof must be "so clear, cogent and convincing as to leave no reasonable doubt in the mind of the chancellor, not only that a contract of the general nature alleged was made, but that the particular contract alleged was made, and its terms and conditions clearly shown." Arfstrum v. Baker, 214 S. W. 859; Gipson v. Owens, 226 S. W. 856; Grantham v. Gossett, 182 Mo. 651; Wales v. Holden, 209 Mo. 552; Kinney v. Murray, 170 Mo. 674. (2) The finding and decree that partition in kind of the real estate in question cannot be made and that the same be sold and appointing a special commissioner to sell the same, are not supported by the evidence and are therefore, erroneous. R. S. 1919, sec. 2047; Carson v. Hecke, 222 S. W. 850. (3) The answer of the witness, Mary Shields, which the defendants moved the court to strike out, was both not responsive to the question, and states the witness's conclusion. This action was, therefore, erroneous.

*Walter F. Schalp* and *August Walz* for respondent.

(1) The evidence in this case does warrant the finding and decree that plaintiff was the adopted daughter of Frank H. Niehaus, deceased. In this case the mother of plantiff performed her part by delivering plaintiff to Niehaus and exercising no control over her thereafter.

Niehaus performed a part of the agreement by introducing her and speaking of her as his adopted daughter and treating her accordingly. The plaintiff performed her part of the agreement made in her behalf by living with the Niehauses as their child until about June 18, 1888, and performing such services as their natural child would have performed under like or similar circumstances. Niehaus continued to treat and speak of her as his adopted daughter long after plaintiff had left the Niehaus home, and under these circumstances courts will find that plaintiff was an adopted child of said Frank H. Niehaus, and as such is entitled to partition as prayed. Fisher v. Davidson, 271 Mo. 205. The *status* of plaintiff as an adopted child was fully established in and prior to her marriage to F. W. Kay. That *status* once established was not forfeited by any subsequent act of plaintiff. Remmers v. Remmers, 239 S. W. (Mo.) 514; Dillman v. Davidson, 239 S. W. (Mo.) 508. The evidence is sufficient to prove an agreement to adopt, which is strongly supported by the testimony of E. F. Vogt. Signaigo v. Signaigo, 205 S. W. (Mo.) 23. (2) An agreement to adopt may be shown by acts. Roberts v. Roberts, 223 Fed. (C. C. A.) 776; Rauch v. Metz, 212 S. W. (Mo.) 362; Horton v. Troll, 183 Mo. App. 690. The acts of Frank H. Niehaus, deceased, as disclosed by the evidence, when considered in the light of all attending circumstances, negative every explanation other than that he was so acting under and pursuant to an arrangement or agreement with the mother of the plaintiff to take plaintiff and adopt her as his child and consequent heir. The contract is more effectively proven by such evidence than that of oral conversations referred to by Frank H. Niehaus, Jr., defendant, Emil Niehaus, defendant, and Frank H. Niehaus, considering their relation and interest in the outcome of this cause; and the law will specifically enforce it, and may, if necessary, imply a contract. Lynn v. Hockaday, 162 Mo. 124; Horton v. Troll, 183 Mo. App. 677, 690; Roberts v. Roberts, 223 Fed. (C. C. A.) 775; Martin v. Martin, 250 Mo. 545.

GRAVES, J.—Action to specifically enforce an alleged agreement to adopt plaintiff as a child of Frank H. Niehaus, Sr., and his then wife. The agreement to adopt is alleged to have occurred in 1883. Plaintiff then was some thirteen years of age, and she remained with the Niehaus family until she reached the age of eighteen years, at which time she left that family and later married one F. W. Kay. The petition also asks for the partition of certain real estate, owned by Frank H. Niehaus, Sr., at the time of his death, alleging that there was sufficient personal estate to fully discharge all debts. The case seems to have been tried as if such was a fact. The defendants are the two sons of the said Frank H. Niehaus. The estate was in the course of administration when this suit was brought. Niehaus, Sr., died in 1918. The answer admits that he died seized of the land in question, but avers that the two sons (the defendants) were his only heirs. Other allegations of the petition "defendants deny generally," to use the exact language of the answer. Reply was a general denial. The court found that the allegations of plaintiff's petition had been sustained by the evidence, and decreed that the plaintiff was the adopted daughter of Niehaus, Sr., was entitled to partition of the lands in question, and was entitled to one-third interest therein. Niehaus, Sr., had been married twice, but was single at time of his death in May, 1918. Defendants are children by the first wife. The trial court found that Niehaus, Sr., and his first wife recognized plaintiff as an adopted daughter; that the second wife so recognized her; and that these defendants so recognized her. The assigned errors in this court are:

"The trial court erred:

"1. In finding and decreeing that the plaintiff was adopted by Frank H. Niehaus and his first wife as their child and that as such she was and is entitled to an undivided one-third interest in the real estate described in the petition and decree.

"2. In finding that partition in kind of the real estate in question cannot be made, and in ordering a sale

thereof and appointing Oscar J. Mudd as special commissioner to make such sale.

"3.   In overruling defendant's motion for a new trial, because at the trial the court overruled defendant's motion to strike out the answer of the plaintiff's witness, Mary A. Shields, stating her conclusion, referring to the plaintiff, 'They said she was dopted, an adopted child.'

"4.   In failing to find and decree that the defendants are the sole owners of the real estate in question and that the plaintiff has no right, title or interest in the same as prayed in defendants' answer."

The real question is whether or not the evidence is sufficient to show an agreement to adopt. There was no deed of adoption shown, but there was an indenture of apprenticeship. The contention on the one side is that plaintiff was in the Niehaus family by reason of the indenture of apprenticeship, and on the other that there was an agreement to adopt. Appellants contend that the evidence fails to show an agreement to adopt. The case is therefore more one of fact, than one of law.

I.   The law of this case is simple. The petition is argumentative in its language, and thus has much therein that is pure surplusage, but stripped of this, it charges (1) an agreement to adopt her made by her mother and Niehaus, to which she herself assented, and (2) an agreement between her mother and herself upon one side, and Niehaus on the other to adopt plaintiff. It avers no formal deed of adoption. In cases of this character it has been said in Grantham v. Gossett, 182 Mo. l. c. 671:

*Contract: Inferred from Acts and Admissions.*

"In all the cases of this kind that have come before this court we have held that to sustain the alleged oral contract the proof must be clear, cogent, and convincing as to leave no reasonable doubt in the mind of the chancellor, not only that a contract of the general nature alleged was made, but that the particular contract as alleged was made, and its terms and conditions clearly

shown. It will not satisfy the requirement to show that there was an understanding of an indefinite character, leaving its terms more or less to inference, that the child was to be taken and reared as a member of the family." [See also Wales v. Holden, 209 Mo. 552, and Arfstrum v. Baker, 214 S. W. l. c. 860.]

The foregoing is the rule as to the character of proof to be made. But whilst this is true the contract or agreement to adopt may be shown by the acts and admissions of the parties. In Horton v. Troll, 183 Mo. App. l. c. 690-1, the St. Louis Court of Appeals says:

"It is sufficient to say that, tested by the many cases which have been before our own courts, it establishes the fact of adoption by acts which estop both Dr. and Mrs. Dunham, and those claiming under them, adversely to respondents, from now disputing it. That adoption may be established by acts and conduct, where no legal deed of adoption has been executed and recorded in due form of law, has been settled in our State by many decisions of our Supreme Court as well as of the Courts of Appeals. In passing see Sharkey v. McDermott, 91 Mo. 647; Healey v. Simpson, 113 Mo. 340, 20 S. W. 881; Nowack v. Berger, 133 Mo. 24, 34 S. W. 489; Lynn v. Hockaday, 162 Mo. 111, 61 S. W. 885; Hockaday v. Lynn, 200 Mo. 456, 98 S. W. 585; Wales v. Holden, 209 Mo. 552, 108 S. W. 89; Westerman v. Schmidt, 80 Mo. App. 344; Thomas v. Maloney, 142 Mo. App. 193, 126 S. W. 522."

So too the Federal Circuit Court of Appeals for our district (the 8th) in Roberts v. Roberts, 223 Fed. l. c. 776, says:

"The argument by which we are asked to reverse the decree is that there was no direct and clear evidence of an agreement to adopt at the time Myra J. Roberts was received into the family of Charles J. Roberts. There is good reason why such evidence is wanting. All of the parties to the transaction are dead, and Myra J. Roberts was herself a babe at the time of the adoption. It seems to us that in such a case it is not necessary that the court first have direct proof of the making of the

contract, and then proceed forward from the contract thus established to the conduct evidencing its existence. We think it is possible to reverse that process, and if the statements and conduct of the adopting parents are such as to furnish clear and satisfactory proof that an agreement of adoption must have existed, then the agreement may be found as an inference from that evidence.''

In this case, the Horton Case, supra, as well as the cases cited therein are noted. Under the established law we feel that we should rule (and we do so rule) that the contract to adopt may be shown by the acts, conduct, and proven admissions of the adopting parties, although there may be no direct proof of the agreement or contract. Under the rules aforesaid the evidence in this case must be measured. There is no direct proof of a contract to adopt as between the mother and Niehaus and wife. In fact the only direct proof shows an indenture of apprenticeship signed by the mother and Niehaus. The father was dead and the mother was consumptive, as may be gathered from the evidence. Nor is there direct proof of a contract to adopt as between the mother and the little girl upon the one hand and Niehaus and wife on the other. In weighing the evidence, the foregoing facts stand out in bold relief. The facts in evidence we shall consider next, along with the applicable rules of law stated, supra. If those facts measure up to the rules of law, the case must be affirmed; but if not, it must be reversed.

II. Going to the facts not stated, supra, we find that on May 17, 1883, Anna Stammerjohann, the mother, by deed of indenture apprenticed or bound her daughter, this plaintiff, to Frank H. Niehaus ''to learn the trade and art of cooking, nursing and general housework, to dwell and serve from day of ensealing hereof until the 27th day of June, A. D. 1888, when said minor will arrive at the age of eighteen years.'' In the same instrument Niehaus covenanted:

Facts Justifying Inference of Adoption.

"To furnish to the said Wilhelmina at all times and seasons suitable clothing, food and attention, in sickness and in health, and to teach her the said trade and art of cooking, nursing and general housework and completely as the same may be in the power of the representative parties to teach and receive to give her a good public school education, and in general will as far as in him lies train her up in habits of industry, temperance and virtue the same as if she were his own child."

This instrument was signed by the mother and Niehaus on the day of its date, and duly acknowledged before a notary on the same day. Shortly prior thereto the child was placed with Niehaus, and in about a year thereafter the mother died. For the defendants there is also evidence that plaintiff said her contract time was out on June 27, 1888, and on that date she left the Niehaus family, and sought employment of her own. On this line of evidence the defendants urge that there was no adoption or agreement to adopt.

On the other side there is evidence that Niehaus never sent the plaintiff to the public schools, but only sent her to a parochial school about one year, or just long enough to have her confirmed in the church. In this they contend he was not acting under the contract signed by the mother, supra, but was evidently acting under a subsequent understanding to adopt. It is shown that the mother could not speak nor read English. At the time of the execution of the contract, supra, Niehaus and wife had a little baby girl, but this child died in June, 1883, shortly after plaintiff came to the Niehaus home. Plaintiff nursed this little one for this short time. Every thing that plaintiff did was just as consistent with a performance of the contract of apprenticeship, as with the idea of adoption. Even the manner and time of leaving was consistent with either contract, because if adopted, she reached her majority at eighteen years, and could, if she so desired, have left at the time she did. Her statement, however, that her time was up on her eighteenth birthday was a fact against the idea of an adoption. On the other hand, the proof is quite clear that

Niehaus did not give her a public school education, which act is inconsistent with the contract now relied upon by defendants. His conduct in this respect would be con-sistent with the idea of adoption. In addition to these matters, we have in addition the fact that there is proof of admissions (undenied by both defendants) that plaintiff was an adopted child. In addition, witness after witness testifies that Frank H. Niehaus and both his first and second wife said that she had been adopted. Some of these many statements were in the presence of the plaintiff. Ed Voght, a nephew of Niehaus, Sr., heard the old gentleman say:

"Well, now we have got this girl, this Minnie, taking her up as one of the family and intend to adopt her and educate her."

This was in 1883, and only indicates an intention to adopt, but is material when taken with other evidence. Later on the same witness on cross-examination said:

"Q. Now you say your uncle said that he had taken the girl in as one of the family? A. Yes, sir.

"Q. And that he intended to adopt her? A. Yes, sir.

"Q. But he did not say anything about an agreement with her mother? A. No, sir; not at that time.

"Q. Or at any other time in your presence? A. Yes, sir; I heard that mentioned later on, yes; but she was not present when he said that.

"Q. Who was present? A. The mother.

"Q. But in this first conversation all that he said was in substance that he had taken her as one of the family and intended to adopt her? A. Yes, sir."

Mrs. Strahman, a niece of Niehaus, testified:

"Q. Did Mr. Frank H. Niehaus at that time tell you anything about this girl? Answer yes or no. A. Yes.

"Q. What did he say? A. He said, 'Yes.' His wife said, 'We adopted her.'

"Q. How did this question arise as to the conversation that Mrs. Niehaus had with you and Mr. Niehaus?

A.   Well, just as I stepped in the little girl was holding the baby.  I said, 'You have a nice little girl.'  'Yes,' she said; 'We adopted her; that is our girl.'  I looked at uncle and he said, 'Yes.'  That was all that was said.''

Mary Shields, a witness, after testifying that both of the defendants in this case told her that plaintiff was adopted, further gives some statements as to what the old gentleman said:

"Q.   Who is 'Pa?'   A.   Mr. F. H. Niehaus, she called—Minnie called him 'Pa.'

"Q.   What did she call Mrs. Niehaus number one? A.   'Mama.'

"Q.   What did she call Mrs. Niehaus number two? A.   'Mama.'

"Q.   Did Pa, or Mr. Niehaus, come over?   A.   Yes, sir.

"Q.   What did he say at that time?   A.   He had spoke about Minna, that it was his child, and that he adopted her, and it seemed that he was very much pleased about the girl.

"Q.   Before Wilhelmina came to the house, Mr. Frank H. Niehaus, Sr., talked to you about adopting a child?   A.   No; he has told me after she came.

"Q.   What did he say?   A.   He said he was at the courthouse.  He adopted his Minna or Minnie.

"Q.   Was Mrs. Niehaus there, Mrs. Niehaus number one?   A.   Mrs. Niehaus number one was there in each other's presence.

"Q.   Did she say anything?   A.   She also said they adopted Minnie.  They were glad, very glad to have her.

"   .   .   .

"Q.   You do remember, though, Mr. Niehaus told you at one time that he had been to the courthouse?   A. Yes, sir.

"Q.   Now, what did he say; I want his words, not what you say, but as well as you recollect them, what did he say about that visit to the courthouse?   A.   He said, 'I have been up to the Courthouse; I have got Minnie now; I have got a daughter.'

"Q.   Did he say, 'I have got a daughter?'   A.   Yes, sir.

"Q.   Or did he say, 'I have got a little girl?'   A. 'A daughter.'

"Q.   Was he speaking English or German?   A.   At times he said—

"Q.   I mean this time?   A.   English.

"Q.   He was speaking English?   A.   Yes, sir.

"Q.   He said he had been to the courthouse?   A. Yes, sir.

"Q.   And then what did he say?   A.   He had a daughter now.

"Q.   Use the words now?   A.   He said, 'I was at the courthouse, and have a daughter now,' and he mentioned my name, he said 'Mary'—towards the last he was a friendly man, he said, 'I have got a daughter now.'   .   .   .

"Q.   You say, Mrs. Niehaus was there at the same time?   A.   Yes, sir; she was with him; they were both together, and she was very happy that they had her. She was talking in between when he was talking.   .   .   .

"Q.   Who said she was adopted?   A. F. H. Niehaus.

"Q.   What did he say?   A.   He said that was his adopted child.

"Q.   Did he use the word 'adopted?'   A.   Yes, sir; he used the word 'adopted.'

"Q.   Did he use the expression 'our girl' when he spoke of her?   A.   He did not always say, 'Our adopted child;' sometimes he said, 'Our adopted daughter,' or 'Minna.'   That is what he called her.

"Q.   Didn't he use the expression, 'Our girl?'   A. 'Our daughter,' a great deal.

"Q.   You say he used the expression 'our daughter?' A.   Yes, sir; if he introduced her to somebody he said, 'This is our Minna,' or, 'Our daughter.'   .   .   .

"Q.   When did you hear him speak of Minnie?   A. About adoption?

"Q.   Yes.   A.   This was brought up quite often to me, and after the marriage to Mrs. Niehaus he was

troubled with rheumatism a great deal and he sat in the back of the store with me, and he often complained. Then he told me about Minnie being an adopted child.

"Q.   What did he say when he spoke about Minnie? A.   He used to say he was glad he had his Minna.   At times he would say 'his Minna.'

"Q.   He said he was glad he had his Minna?   A. Yes, sir.

"Q.   What else did he say?   A. 'I am going up-stairs now and let Minna give me something,' you know, on account of his feet.   He was troubled with rheumatism a great deal.   I asked him where the boys were, and he said they were in bed, or something like that."

Mrs. Anna C. A. Griebel, a niece, among other things, said that Niehaus, Sr., his wife and the three children (the plaintiff being one of them) visited their house.   She then tells what was said, thus:

"Q.   Which children?   A.   They had Mrs. Kay with them and Frank and Emil.   They were at our house visiting my mother.   My mother broached the subject to her and said, 'Now, you don't need Minnie—the baby is dead—as a nurse girl.'   Why, she said, 'We adopted her.'

"Q.   What do you mean by 'her?'   A.   Minnie; she said, 'We adopted Minnie.' "

THE COURT:   Who said it?   A.   My mother said she would not use Minnie as a nurse girl any more as the baby was dead.   She said, 'Why, we adopted her.'

"Q.   Who do you mean said that?   A.   My aunt said that—Mrs. Niehaus.

"Q.   Was Frank H. Niehaus there then?   A.   Yes; I said, 'Have you adopted her by court?'   She said, 'Cer-tainly.'   She said, 'We'll educate her; she is our child.' That is all the conversation we had."

Lizzie Brunkschulte, who worked next door to the Niehaus place, said that at one time plaintiff was over at her place, and Mr. Niehaus came after her, and plaintiff did not want to go. ̄ Being pressed as to what was said she answered:

"Q.   For the purpose of refreshing your memory,

were you ever working at a time when Minnie was aiding in washing dishes and Frank Niehaus called her away or started to call her away? A. Yes.

"Q. Did Mr. Niehaus come down after Frank and try to call her away? A. Yes, sir.

"Q. What was said by Minnie at that time, if you remember?

"MR. LUBKE: When? You mean in the presence of Frank H. Niehaus?

"MR. WALZ: Yes.

"MR. LUBKE: All right.

"THE WITNESS: Well, she said she couldn't go, they wanted her to come home, and she did not want to go. Mr. Niehaus says, 'You come on home.' She said, 'I won't; I will run away.' He said, 'You can't run away; you are my adopted daughter.'"

Mattie Young details the incident in this language:

"Q. Did you ever hear Mr. Frank H. Niehaus speak of Minnie? A. Yes, I have, to my mother. I was in the presence.

"Q. What did he say? A. Well, he said he was glad he had Minnie because he was sickly and that she was like a daughter to him and he had adopted her and he was glad he had.

"Q. Did you ever hear her address Mr. Niehaus? A. Yes, that time when he came there and wanted her to come home. She had been telling me she was not treated right—

"MR. LUBKE: Wait a minute, now.

"Q. Was Mr. Niehaus there? A. He came there for her.

"Q. When was that? Was that before he married Mrs. Heinrich? A. Yes, sir.

"Q. After the death of the first Mrs. Niehaus? A. Yes, sir.

"Q. Go ahead; do not tell what Minnie told you. A. He came there—first the son came there—she had been complaining to me she was not being treated right. I did not know whether—

"Q. Don't state that. A. Frank came after her and she said that she would not go home. He said, 'I will tell my father on you.' He came over, and she said, 'Daddy, I don't want to come home.' He said, 'You have to.' She said, 'I will run away.' He said, 'You can't; you are my adopted daughter, and you can't run away.' ''

The record is replete with evidence of this character. It shows that plaintiff called Mr. Niehaus "Pa," and his wife "Ma" or "Mama." She also addressed the second wife in the same way.

If a contract to adopt can be shown by admissions, then the judgment *nisi* is correct as to the adoption of plaintiff. As stated, no witness testifies to an oral contract to adopt. All the parties are dead and the lips of plaintiff, if she knew any thing, were sealed by the ruling of the trial court. First, we have the fact that Niehaus did not comply with the contract of apprenticeship, by sending the girl to the public schools, a circumstance tending to show that he was not acting under that contract. His conduct was inconsistent with that contract, but would be consistent with the control of an adopted child. His admissions, so thoroughly shown, justified the trial court to infer a previous contract to adopt. In other words if a contract to adopt can be shown by acts, conduct, and admissions, then the trial court was right. Under our rulings such a contract can be proven in that way. The rule we have stated supra, and will not reiterate.

There are several other contentions, but upon examination we concluded that they are without merit.

The judgment should be affirmed, and it is so ordered. All concur.