RUSSELL BLAND and MABLE BLAND SEXTON v. VIRGINIA BUOY, Administratrix of the Estate of HALLECK BLAND, and WALTER BLAND, JULIA BLAND BLAICH, CLAUDE VANCE and VIRGINIA BUOY, Appellants.—74 S. W. (2d) 612.

Division One, September 18, 1934.*

*NOTE: Opinion filed at May Term, 1934, July 17, 1934; motion for rehearing filed; motion overruled at September Term, September 18, 1934.

*Don C. Carter* for appellants.

*M. H. Pemberton* and *North T. Gentry* for respondents.

FERGUSON, C.—Halleck Bland died, intestate, in Audrain County June 15, 1929, leaving no widow or lineal descendants surviving. His sister Mrs. Virginia Buoy applied for and letters of administration were issued to her as administratrix of the estate on June 18, 1929. The plaintiffs herein, Russell Bland and his sister (Mrs. Mable Bland Sexton) commenced this suit in equity in the Circuit Court of Audrain County, September 27, 1929. Plaintiffs claim to be the adopted children of the deceased Halleck Bland and as such his only heirs at law. The defendants are the administratrix and all the collateral heirs; defendant Walter Bland being a brother, defendants, Julia Bland Blaich and Virginia Buoy being sisters and defendant Claude Vance (a son and the only heir at law of Mrs. Alice Vance, a sister) being a nephew, of the deceased Halleck Bland. The cause went on a change of venue to the Circuit Court of Randolph County. The judgment and decree of the trial chancellor was for plaintiffs and defendants have appealed.

At the time (1912) that the plaintiffs, brother and sister, were taken into the home of Halleck Bland and wife, under an alleged oral promise or agreement on the part of Bland to adopt them the statutory method of adoption in this State was by a deed of adoption. No deed of adoption was ever executed by Bland nor was any written agreement or contract to adopt entered into by him. Russell Hubbard, age six years, and Irene Hubbard, age four years, brother and sister (these plaintiffs), were admitted to the Methodist Orphans' Home at St. Louis, April 23, 1910. They remained as inmates and in the care of that institution for two years and until April 25, 1912, when they were taken by Halleck Bland and wife into their home. The record entry upon the official records of the Methodist Orphans' Home "on April 25, 1912" is that said children were "taken by Mr. Halleck Bland, Centralia, Mo., for adoption." The petition alleges that in April, 1912, when plaintiffs were of the ages of eight and six years "Halleck Bland and his wife took both of the plaintiffs, whose names were then respectively Russell Hubbard and Irene Hubbard, from the Methodist Orphans' Home in the city of St. Louis and took them from the care and control of that home and under the order of the juvenile court of that city and placed the plaintiffs in the household of said Halleck Bland and wife promising said Methodist Orphans' Home that they would provide and care well for the plaintiffs and adopt them as their children . . .; that from that time on until the plaintiff, Russell Bland, moved away to engage in business for himself and the plaintiff, Mable Bland, married and moved away with her husband, the plaintiffs continued to reside in the household of Halleck Bland;" that "plaintiffs yielded a willing obedience to the said Halleck Bland and wife under the impression and belief they were the legally adopted children of said Halleck Bland and wife . . . lived with them in their home as

members of their family and were recognized by both Halleck Bland and wife as members of their family and were held out to the world by them as their adopted son and adopted daughter until the death of the wife of said Halleck Bland; that after the death of his wife, said Halleck Bland held plaintiffs out to the world as his adopted son and adopted daughter;" that plaintiffs "discharged all of the duties usually discharged by children to their parents and that during all of said years of said relationship yielded all of the affection and obedience due from a child to a parent . . . and at all times believed and supposed . . . that all legal requirements had been complied with and that they were the legally adopted children and heirs of Halleck Bland and wife." The petition at some length sets out and enumerates specific acts and conduct on the part of Halleck Bland which allegedly show that the relationship of parent and child existed between Halleck Bland and plaintiffs and that he recognized and treated them as his adopted children and concludes that "in equity and good conscience the plaintiffs are entitled to be treated in the distribution of" the estate of Halleck Bland, deceased, "as though a formal deed of adoption had been signed and recorded" and prays that a decree be entered "establishing" plaintiffs' "right of adoption and declaring them the heirs at law and only heirs of Halleck Bland by virtue of said adoption." Defendants' joint answer was a general denial. The trial chancellor entered a decree finding that, "the decedent, Halleck Bland, in the year 1912, agreed with the Methodist Orphans' Home Association, a corporation, of St. Louis, to adopt" plaintiffs; that "pursuant to such agreement said association surrendered full custody and control of said children to Halleck Bland and he took and reared said children as his own and under his own name;" that "said Orphans' Home Association fully performed its part of said agreement and that plaintiffs accepted the terms of said agreement and fully performed their duties as adopted children of said Halleck Bland and are entitled to have said contract for adoption fully performed." It is then decreed that plaintiffs "are the adopted children of Halleck Bland, the decedent, with all the rights and privileges inuring to adopted children."

A farm of eighty acres in Audrain County (appraised at $3200) constituted all the real estate owned by Bland at his death. His estate otherwise was in the form of personalty, money, notes, live stock, farm machinery and other personal property of an appraised value of $6656.92. Title to the entire property and estate of which Bland died seized is involved and in controversy hence our jurisdiction of this appeal.

It will be seen that plaintiffs rely upon what is generally denominated an equitable adoption, i. e., that Bland took them from the Orphans' Home into his home and under his care and control

pursuant to an oral promise or undertaking on his part to adopt them as his children; that said agreement has been fully performed on the part of all parties concerned except that Bland failed to execute a statutory deed of adoption but that to all intents and purposes such undertaking was effectuated and carried out and that now equity requires that they be adjudged, and declared to be, the children by adoption of Halleck Bland.

The sufficiency of the evidence to establish the alleged parol agreement or undertaking is challenged. The admissions, statements, course of conduct and acts of Bland, in reference to these plaintiffs, from the time he took them into his home until his death; the attitude and manner of life of plaintiffs in the Bland home and the surrounding and accompanying circumstances and subsequent events as shown by numerous, and for the most part wholly unrelated and disinterested, witnesses together with the record of the Methodist Orphans' Home which was made at the time Bland took plaintiffs from the home, constitute the evidence upon which plaintiffs rely to establish such agreement or undertaking on the part of Bland and its consummation in equity. Halleck Bland and his wife resided on a farm, which he owned, in Audrain County, a few miles northwest of Centralia. They were childless; no child was ever born to them. The plaintiffs were the only children they ever took into their home. They were members of a nearby Methodist Church known as Appleman's Chapel. Bland seems to have been very devoted and active in the work of this little Methodist Church. He was an officer of the church, superintendent of the Sunday School and a teacher in the Sunday School. While there is but little direct evidence concerning the events immediately connected with the taking of these plaintiffs from the Methodist Home by Bland and his wife it does appear from statements accredited to them that the negotiations extended over a period of perhaps two weeks or more. Bland and wife went to St. Louis, visited the Methodist Home with the intention of taking a child into their home; were attracted by this brother and sister, Russell and Irene Hubbard; requested that they be permitted to take both children; references were given; the Blands returned home, correspondence followed and the Home made the usual investigation. Under date of April 11, 1912, an order was made in the Juvenile Court of City of St. Louis transferring or changing the custody of these children "from the Methodist Orphans' Home to Mr. Halleck Bland, Centralia, Mo." Presumably this procedure was had by and at the instance of the Methodist Orphans' Home and separate commitments were issued out of that court authorizing the Blands to take the children into their custody . Thereafter on April 25, 1912, the children were received by the Blands from the Methodist Home at which time the record of that institution relating to these children, as heretofore stated, was concluded with the entry: "Taken

by Mr. Halleck Bland, Centralia, Mo., for adoption, on April 25, 1912.'' Russell was at that time eight and Irene six years of age. Immediately Irene's name was changed to Mable and both children given the name of Bland so that they thereupon became in name Russell Bland and Mable Bland and were thereafter so known. The change in name was, of course, dictated and made by Mr. and Mrs. Bland. The testimony of the witnesses for both plaintiffs and defendants agrees that from and after the time these children came to the Bland home they were known as, and went by the names of, Russell and Mable Bland. Shortly after the children came to the Bland home, Mr. Bland told E. S. Anderson, a neighbor, who resided on a nearby farm, that he (Bland) ''had gotten the children out of an Orphans' Home in St. Louis and that he had adopted them; that he was required to do so; that the Home required him to adopt them.'' From the first the children addressed, and referred to, Mr. and Mrs. Bland, as ''papa'' and ''mama,'' and in later years to Mr. Bland as ''father'' and ''dad.'' Recalling the age of the children at the time they were taken into the Bland home it is a reasonable inference, we think, that they were instructed by the Blands to so address them and consider them. The children were sent to school and were known among their associates as Russell and Mable Bland. When the Blands went on visits about the neighborhood or to ''town'' (Centralia) they took the children. Without undertaking to review the mass of details appearing in the evidence suffice it to say that the evidence is overwhelming that Bland and his wife held these children out as their children and in every way and manner of attitude and treatment assumed the relationship of parents toward them. Merchants in Centralia testified that they bought supplies and incidentals for the children; that the children would buy school books, drugs, stationery and other articles in the stores at Centralia having same charged to the account of Bland and that he paid such accounts. Some of these witnesses thought, and did not learn differently until many years later, that the children were the natural children of Mr. and Mrs. Bland. The children joined Appleman Chappel as Russell and Mable Bland. Mr. Bland arranged for Mable to take piano lessons and purchased a piano for her and Russell was given violin lessons. Mable was soon the regular pianist at the Appleman Chapel and later at both the Sunday School and church services. She became, when older, a teacher in the Sunday School. Both Mr. and Mrs. Bland spoke of and referred to the children as ''our children,'' ''my children,'' ''my daughter,'' ''my son,'' ''our girl'' and ''our boy'' and ''as if they were their own children.'' They expressed no displeasure or dissatisfaction with the children, spoke of them affectionately and treated them kindly. All the witnesses in the case, and there were some forty or more, neighbors, acquaintances, relatives and intimate friends, agree that the children were well cared for,

nicely clothed and at all times treated with kindness and affection. It seems that from the first, and through the years following, plaintiffs addressed and spoke of Mr. Bland's sisters, the defendants, Mrs. Virginia Buoy and Mrs. Julia Blaich and Mrs. Alice Vance as Aunt Jennie, Aunt Julia and Aunt Alice respectively and defendant Walter Bland, Halleck Bland's brother, as Uncle Walter. The children were affectionate and obedient. They did the ordinary chores and work about the home and farm and their life and conduct, and their attitude toward the Blands, was that of natural children. The relationship had every feature and aspect of parents and children and is more readily and consistently referable to that status than that of children taken into a home merely for the purpose of serving a charitable end and affording homeless children a refuge in exchange for such temporary services as they might render. In December, 1918, Mrs. Bland died. It appears to the writer as he reads the history of this family, revealed by the evidence, that after the death of his wife and as he advanced in age Halleck Bland's affection for plaintiffs increased, especially this seems to be the fact as to Mable. While the date of birth of neither of plaintiffs appears in any of the records or the testimony at the time of Mrs. Bland's death in December, 1918, Russell was not more than fifteen and Mable thirteen years of age. Bland arranged for his widowed sister Mrs. Alice Vance to live at his home and keep house and take care of the children. It is not clear to the writer whether Mrs. Vance remained in the home in that capacity during the entire interim between Mrs. Bland's death and Mable's marriage which occurred December 23, 1922. Numerous witnesses, neighbor women, testified that Mable kept house for Bland and was "a good housekeeper" and it does appear that sometime after Mable's marriage and after she and her husband moved to Tulsa, Oklahoma, where he found employment, Mrs. Vance resided with her brother and kept house for him until her death sometime in 1924. Thereafter Bland as some of the witnesses stated "batched" and lived alone until his death in 1929. In 1921 Russell with Bland's knowledge, approval and consent enlisted in the United States Army, served a full enlistment and received an honorable discharge on December 15, 1924. During the period of service in the Army Russell and his father corresponded. The United States census record for the year 1920 shows the family of Halleck Bland composed as follows: "Halleck Bland, head" of the family; "Russell Bland, son;" "Mable Bland, daughter" and "Alice Vance, sister." The census enumerator testified that Bland gave him the names of Russell Bland and Mable Bland as his son and daughter respectively. This witness said that some years later he had occasion to go to the Bland home to purchase some honey and at that time Bland mentioned in the course of the conversation that he was then living alone; "that his children were gone." Mable was ill at one time with pneumonia

and Bland displayed much anxiety about her and employed nurses to attend her for some weeks. At another time, and after Mrs. Bland's death, Mable suffered an attack of appendicitis. Bland was worried and anxious. Two doctors were called and an operation performed. Bland told the doctor in charge of the case "not to spare any expense." On that occasion, besides two local doctors, Bland called his sister, the defendant Julia Bland Blaich, from St. Louis and she came to assist during the operation and illness. Mrs. Blaich is frequently referred to in the testimony as Doctor Blaich and seems to have been a physician. She resided in St. Louis. She did not testify in the trial of this case nor even attend the trial. The wife of defendant Walter Bland and Bland's sister, defendant Virginia Buoy, assisted Bland and helped attend Mable Bland during her illness. Bland approved of Mable's marriage to a neighbor boy, Stanley Sexton. Mable stayed with Mrs. Dollie Faddis "a week before she was married." Mr. Bland engaged Mrs. Faddis to make "Mable's wedding clothes" and "paid for them." During the time Mable was at Mrs. Faddis home "Mr. Bland would call every day over the phone and ask how his girl was." "When Mable was getting ready to marry" Bland told Mrs. Jones a Centralia milliner "to let Mable have whatever she wanted and he would pay for it." Mable was married under the name of Mable Bland. Following the marriage on December 23, 1922, Mable and her husband went to the Bland home where they continued to reside for four or five months; Mable keeping house and her husband working on the farm. Bland was quoted as saying, in substance, that he would have liked to have had the children (meaning Sexton and Mable) live with him but he realized that his farm would not provide sufficient employment and income. Sexton procured employment in Tulsa, Oklahoma, and he and Mable went there to make their home and have since resided there. Following Mable's marriage Bland always referred to Sexton as his son-in-law. Bland and Mable corresponded regularly; their interchange of letters continuing to the time of his death. A large number of his letters to her are in evidence. The letters uniformly commenced with the salutation: "Dear Children." Some were signed merely Halleck, others "Dad" and one "old Dad." His letters reveal that Bland was a man of scant education. A child was born to Mable, a daughter. Bland was very happy. He had told his neighbors of the approaching event and now that it had occurred he hastened to impart the tidings to neighbors and friends that he had a grandchild. Mable soon came to visit him and spent sometime at his home. He took her and the baby on visits to the homes of his neighbors and relatives, to church and to Centralia. He would carry the baby and with characteristic grandfatherly pride display the little girl and inquire: "Don't you think I have a nice grandchild;" and speak of and refer to the baby as "my grandchild,"

"my little granddaughter" or "my grandbaby." Later a second child was born to Mable. This baby was ill from birth and after a few weeks died. During the illness of the mother and child Bland was kept informed by letters about the condition of the mother and child. He talked to neighbors and friends about the situation and manifested and expressed concern and anxiety. He sent Mable money. When the baby died he was greatly grieved. His "eyes filled with tears" as he told his neighbors about the death of his "grandchild" and he wrote a beautiful and touching letter to "my children," which is set out in the record. The letter is that of a devoted father to a devoted daughter. It seems that Mable made frequent visits home; that Bland looked forward to her coming; that after the death of Mrs. Vance some of these visits were of considerable length and that at such times she would "clean the house," "can fruit" and "keep house" for him. He spoke of Mable as his daughter and her child as his grandchild. Mrs. Dollie Faddis testified that, "about a week before Mr. Bland died I saw him in Centralia and asked him as usual how Mable was;" that in the ensuing conversation about Mable he said: " 'I gave up my sister and I gave up my wife' and he began to cry and broke down and said: 'but the hardest was giving up my daughter, she was the only one who did anything for me.' I said Mr. Bland she was not your daughter. He was crying and said: 'She is my adopted daughter.' " A letter from Mable to Bland, written in 1925, was put in evidence by defendants. The letter commences, "My dear daddy" and states that her husband has recently had a promotion; says, "daddy you are getting older all the time . . . you have made enough to last you your life time why don't you enjoy it instead of working yourself to death and suffering and staying by yourself. You have no one but yourself to keep . . . you are welcome at my house all the time and will get good treatment . . . the best I have. I love you more than anybody else and I want you to enjoy life and be taken care of instead of the way you have been the last three years." She expresses regret that she has been "so much trouble and had so much sickness and cost you so much" and says, "I want to repay you." She further says: "I am sorry from the bottom of my heart for the way I done years ago" and adds that she was as "you know" influenced by "other people." To what incident, conduct or matter this reference applies nowhere appears. We make the observation here that we find no substantial evidence in the record that Mable was other than an average, normal, loving, obedient child unto Bland. A brief reference is made by one witness for defendant, that Mable was "high tempered;" but the writer, does not recall any evidence to the effect that Bland ever expressed any dissatisfaction or displeasure with Mable or that he made any expression to the effect that she had, by her conduct or attitude toward him, caused him unhappiness or sorrow. She seems

to have been very close and dear to him. This lengthy letter in which she urges her father not to work so hard and not to live alone in his old age but to use his means "to enjoy life" has also this statement: "I want you to enjoy life and do as you please and go and come when you want to instead of working and making money for your brothers and sisters to fight over after you are gone." It was admitted by the one defendant who testified that a number of letters from Mable to Bland were found among his papers but this is the only one defendants elected to put into evidence. One witness testified that, "a short time before he died Mr. Bland made a remark in town one afternoon that in his present condition, the way he was feeling, he wished he could sell his live stock, rent his farm and go live with his children." We shall now summarize the evidence relating to Russell and the relationship between him and Bland from and after the death of Mrs. Bland. We have mentioned that Russell with Bland's consent and approval enlisted in the Army in December, 1921, and that during the period of enlistment he and Bland carried on a correspondence. A Centralia clothing merchant, called as a witness for defendants, testified that prior thereto and in March and May, 1920, he sold Russell clothing, an itemized statement of which he produced, and that Russell, who at that time was either sixteen or seventeen years of age, told him to charge same "to him or his father or both;" that he thereupon charged same to "Halleck Bland and Russell Bland;" that Halleck Bland had never authorized him to charge purchases made by Russell to him; that after Russell left (presumably after he had left home at the time he enlisted in the Army) he told Bland that he had "an account against him and the boy;" that Bland refused to pay it and when he asked "where the boy was" Bland replied that, "he didn't know and didn't care very much where he was." It should, we think, be noted here that the merchant's account shows that he sold this sixteen or seventeen year old boy and charged same without any authority from Bland to both Bland and the boy: one pair of gloves, $4; one shirt, $13.45; one pair of shoes, $13, etc. Bland's refusal to pay might be considered in the light of the account presented. It does not appear from the testimony of the several merchants who testified in the case for plaintiffs that Bland ever refused to pay for articles sold by them to either Russell or Mable but on the contrary that he always did so. Bland was evidently so perturbed by these charges made to him in 1920 that in June, 1920, he published a notice in a local paper that he would not be responsible for any debts "Russell Bland may contract." This was also shown by defendants' evidence. During his enlistment Russell visited home for three or four weeks on a furlough. Upon his discharge in December, 1924, he returned home and made his home as theretofore with Mr. Bland. Defendants had evidence showing that in August, 1925, Russell forged Halleck

Bland's name to four bank checks aggregating $21 and obtained the money thereon. Plaintiffs' evidence about this incident tends to show that when the forgeries were detected and reported to Bland he talked with Russell about the matter and acted with both fatherly kindness and firmness as Russell admitted his wrongdoing, asked forgiveness and promised that he would repay Bland when he was able to obtain work. Russell then, with Bland's consent and apparently upon his advice, went to St. Louis. It is fairly inferable, we think, that Bland helped and advised Russell about getting located in St. Louis for Russell seems to have gone directly to his "Aunt Julia's" (Bland's sister, Dr. or Mrs. Julia Blaich's) home and to have thereafter lived in her home until his marriage in 1926. As the writer recalls Mrs. Blaich was instrumental in obtaining work for him and it appears that Russell was thereafter regularly employed and lived an honest upright life. Russell promptly repaid Bland the full amount of the forged checks with interest. Bland was quoted as having told some of the witnesses, in effect, that he had forgiven Russell's wrongdoing and his subsequent attitude toward Russell evidences that he did so. He corresponded with Russell and he was much pleased with his marriage when in October, 1926, Russell married Irene Brookshire who resided with her parents in the city of St. Louis. Russell and his wife soon established their own home in St. Louis. The following May (1927) they made their first visit to Mr. Bland. Accompanied by Irene's father and mother they made a second visit to Mr. Bland during that year. "In the spring of 1928" Russell and Irene, again accompanied by Mr. and Mrs. Brookshire, made a third visit to Mr. Bland. In September, 1928, Russell and Irene again visited Bland. On these visits Mr. Bland greeted Irene with a kiss and in the same manner bade her goodbye on leaving; spoke of her as his "daughter-in-law;" introduced her to his neighbors and friends as "my daughter-in-law," and expressed his approval of Russell's marriage. He addressed Irene as "daughter." He was happy to have them visit him, urged them to come often and was very cordial and hospitable toward Mr. and Mrs. Brookshire. On these visits "Aunt Jennie" (Mrs. Buoy) "and her boys" and other relatives and neighbors would visit the Bland home. When Irene first met Mrs. Buoy she was introduced to Irene as "Aunt Jennie" and Irene thereafter so addressed her and spoke of her; likewise Mrs. Blaich in St. Louis was "Aunt Julia" to Irene. Shortly after Russell's marriage defendant Mrs. Blaich gave a party at her home, in St. Louis, in honor of Russell's wife and defendant Mrs. Buoy attended; the two later called on Russell and his wife at their home and Mrs. Buoy invited them to visit her in Audrain County. Mrs. Brookshire testified that Bland told her of his affection for Mable and Russell; that he had "gotten them out of the Methodist Orphans' Home when Russell was 8 and

Mable 6'' and that he ''had adopted them.'' With pride he showed Mr. and Mrs. Brookshire and Russell and Irene pictures of Mable's baby and letters from Mable. Mr. Brookshire testified that Bland in telling him of Russell's history said that ''he and his wife had adopted Russell and his sister as their children when he got them'' from the Methodist Home. Irene testified that on one visit Bland showed her the certified copies of the orders made in the Juvenile Court of the City of St. Louis transferring the custody of Russell and Mable from the Methodist Home to Bland and spoke of them as ''the adoption papers for Mable and Russell.'' On one of these visits Bland gave Irene and Russell an abundant supply of eggs, potatoes and apples when they started on their return home. At Christmas 1928 Bland visited Russell and his wife in St. Louis, presented a Christmas gift to Irene, had Christmas dinner with them and upon his return home told some of the neighbors ''he had a nice time'' and wrote Mable about his visit and that he enjoyed it. During that visit he learned that a baby was expected and he expressed his happiness. When the baby was born the following February and was later baptized ''Doris Irene Bland'' in the Wagner Memorial Methodist Church of St. Louis he expressed his pleasure and happiness thereat to his neighbors. In writing to Russell and his wife he addressed them, as he did Mable and her husband, ''Dear Children.''

We have already set out some of the evidence adduced on the part of the defendants and will now refer further to the evidence in their behalf. When Mrs. Bland died, intestate, in 1918 her estate, as shown by the inventory thereof put in evidence by the defendants, consisted of personal property of an appraised value of $672.35 and sixty acres of land in Audrain County. Halleck Bland was appointed administrator. The land was sold in a partition sale for $1000. The net proceeds from the sale of the land were turned over to the administrator and on the final settlement ''there was only $73.61 for distribution.'' Halleck Bland, as plaintiff, brought the partition suit. It is stated in the petition in that suit, which defendants put in evidence, that ''Elma Bland died without issue and without lineal descendants, or children legally adopted; that she left surviving her as her sole and only heirs at law her husband, this plaintiff,'' etc. (here the names and relationship of the collateral heirs are set out). The decree found that Elma Bland left surviving her as her heirs at law her husband Halleck Bland and the collateral heirs named. Mable and Russell were not made parties to this suit. ■ The attorney who prepared the petition, verified same and represented plaintiff in the entire matter testified that he knew of the presence of the children, Russell and Mable, in the Bland home (they were then about fifteen and thirteen years of age respectively); that the allegation in the petition that Mrs. Bland died ''without . . . children legally adopted'' was intended as a specific disclaimer ''of

any situation which would entitle the children to an interest in Elma Bland's estate;" and that at that time he inquired of Bland "if he had legally adopted these children and he told me he had not." Plaintiffs objected to the admission of the petition and decree in the partition suit and the testimony of the attorney. The present suit has to do with an agreement to adopt and the adoption of these plaintiffs by Halleck Bland. The statement made in the petition filed in the partition suit that Mrs. Bland had not legally adopted any children was of course literally correct in that she had not executed or joined in the execution of deeds of adoption. However, the allegations of that petition concerning Mrs. Bland if considered can at most have but slight bearing in the present case. This case must be determined upon the sufficiency of the evidence to show an agreement or undertaking on part of Halleck Bland to adopt plaintiffs and that same has been in effect performed though concededly the statutory or legal procedure was not complied with. If the testimony of the attorney that at the time he prepared the petition in the partition suit he asked Bland "if *he* had legally adopted these children and he told me *he* had not" be taken and construed as no more than a statement by Bland that he had not complied with the statutory method of adoption it is of course of no significance but if it was offered as a declaration tending to show that he had not agreed or promised to adopt them and was under no obligation to do so it would seem to be inadmissible under Pursifull v. Pursifull (Mo.), 257 S. W. 117. Plaintiffs had the testimony of a neighbor residing on an adjoining farm, an apparently disinterested witness, who stated that in the course of a conversation while Bland was visiting in his home "one Sunday in 1922" Bland said that when his wife died she "left her estate to him and his heirs" and that "his wife wanted Russell and Mable each to have $500 out of her estate." Mrs. Buoy was the only one of the defendants who testified. She stated: "I was over visiting Mrs. Bland one day (no time fixed) and I said 'Are you going to adopt these children?' She says, 'No, these children might cause me lots of trouble; I am not going to adopt them; I am giving them a good raising.' " Mr. Bland was not present at the time. Mrs. Webster, a sister of Mrs. Bland and her son James, testified that "once in our home and once in her home" Mrs. Bland had said "we are going to take the children and raise them but we are not going to adopt them." Both said they "had never heard Mr. Bland say anything about the children" or "express an opinion in any way about it." While defendant Walter Bland did not testify his wife was the principal witness for defendants. It is impossible to here reproduce either her testimony or that of the other witnesses, in such a way as to reflect the elements and factors affecting and bearing on its weight and value. In that respect the trial chancellor is of course in an advantageous position. How-

ever, separating the statements found in her testimony most directly touching the matter of adoption from the other parts of the testimony she stated that in 1913, before she married Walter Bland, she taught school in the school district wherein the Blands resided; that part of that time she boarded at the home of Halleck Bland; that these children were enrolled upon her school register that year under the name of Russell and Mable (not Irene) Hubbard but she admitted that the children were known both in school and the neighborhood as Bland; that Mrs. Bland told her that "they did not intend to adopt" the children, and that "she did not intend for them to inherit her money. She didn't want these children to have it or the Blands to have it, she wanted it to go to the Seymores;" that Mr. Bland said "if she (Mrs. Bland) didn't adopt them he wouldn't either and if she didn't see fit to give them any of her money he wasn't going to give them any of his money;" and that after Mrs. Bland's death Mr. Bland told her that "there was no record showing they had been adopted by her (Mrs. Bland) and he wasn't going to adopt them and wouldn't will anything to them and they would not inherit any of his money." Mr. and Mrs. Ben Gorman, witnesses for defendants, stated that in December, 1928, they went to Blands' home to pay him the interest on their note which he held; that Mrs. Gorman remarked to Bland "you have more money than anyone and you have hogs, chickens and eggs" and that Bland replied: "I do make some money but I spend it and what I do have I expect my brothers and sisters to have;" and that in the same conversation he spoke of Mable, showed them a Christmas present Mable had sent him and said Mable had recently had sickness in her family. Mrs. Gorman said she taught school in that district in 1914 and that Russell and Mable were known in school and in the neighborhood as Russell and Mable Bland.

■ It is well settled in this State by a long line of decisions that under proper circumstances and upon a sufficient showing a court of equity will recognize and enforce an oral contract to adopt. [Taylor v. Coberly, 327 Mo. 940, 38 S. W. (2d) 1055, and cases there cited, and Drake v. Drake (en banc), 328 Mo. 966, 43 S. W. (2d) 556.] This is not however questioned by appellants and the determination of this case turns upon the sufficiency of the evidence to establish the alleged oral contract or agreement by Halleck Bland to adopt plaintiffs. We have held that to sustain such an oral contract the proof must be clear, cogent and convincing and of such a character as to leave no reasonable doubt in the mind of the chancellor that the particular contract alleged was made. [Kay v. Niehaus, 298 Mo. 201, 249 S. W. 625; Grantham v. Gossett, 182 Mo. 651, 81 S. W. 895; Wales v. Holden, 209 Mo. 552, 108 S. W. 89; Lamb v. Feehan (Mo.), 276 S. W. 71; Taylor v. Coberly, supra; Drake v. Drake, supra.] But "it is not indispensable" that the contract to

adopt "be shown by direct evidence;" it "may be shown by the acts, conduct and admissions of" the adopting party. [Drake v. Drake, supra, and Kay v. Niehaus, supra, and cases therein cited.] If therefore the statements, admissions and conduct of the adopting parent "are such as to furnish clear and satisfactory proof that an agreement of adoption must have existed then the agreement may be found as an inference from that evidence." [Drake v. Drake, supra; Roberts v. Roberts, 223 Fed. 775, 138 C. C. A. 103; Kay v. Niehaus, supra.] We have, to some extent, discussed and commented upon the evidence in the course of our statement and deem a further review or an analysis thereof unnecessary. As measured by the foregoing applicable rules, we think, the evidence sufficient to establish the alleged oral undertaking or agreement by Halleck Bland to adopt plaintiffs. That the agreement was fully performed on the part of all the parties affected thereby, except that Bland did not execute a formal deed of adoption, is also satisfactorily shown. The entry upon the official records of the Methodist Home very strongly indicates an agreement or promise by Bland to adopt the children as a condition of the home giving the children into his custody. The evidence shows that the home placed orphan children in homes in two ways; for adoption or merely for their "keep and care" without adoption and apparently it was the practice to have an understanding concerning the terms upon which the child was placed. Bland's statements and admissions, his conduct and attitude, and the relationship established and existing between him and plaintiffs when considered together with the entry made upon the records of the Methodist Home at the time he took the children and his unequivocal statement to his neighbor and friend Anderson made "shortly" thereafter that the home required that he adopt the children and his other statements found in the evidence that they were his adopted children warrants the conclusion that such agreement was made and sustains the finding and decree of the trial chancellor to that effect.

Appellants argue that the Methodist Orphans' Home had no authority, was not legally authorized, to contract for adoption and that if such agreement was made by Bland with the home it was invalid. The contention cannot be allowed. To establish the agreement it was enough to satisfactorily show that Bland took these children from the home, and the home gave them into his custody and keeping, upon a promise or undertaking by him that he would adopt them. The home had the custody and control of these children, acted for and represented them and Bland's undertaking in relation to these minor children, so entered into, may now, under the facts of this case, be invoked and enforced by them.

In considering the evidence we have had in mind the finding of the trial chancellor thereon with his better opportunity to weigh and evaluate the testimony and, as stated, we find the evidence, under

984

the tests applicable in this class of cases, sufficient to warrant and sustain the decree entered by the trial chancellor. The judgment of the trial court is therefore affirmed. *Sturgis* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.