**HOGANE v. OTTERSBACH et al.**

No. 44132.

Supreme Court of Missouri.
Division No. 1.

June 14, 1954.

Irvin H. Gamble, St. Louis, for appellant.

Lashly, Lashly & Miller, John H. Lashly, St. Louis, for respondent Dorothy Sandweg.

Richard M. Stout, Robert L. Brown, St. Louis, for respondent Mary Ottersbach.

CONKLING, Judge.

Gladys M. Hogane, plaintiff below and appellant here, has appealed from the judgment of the circuit court which sustained the motion to dismiss filed by defendants at the close of the evidence offered by plaintiff. In her petition seeking a decree of equitable adoption plaintiff prayed "that this plaintiff be decreed to be an adopted daughter of the said Erich W. Ottersbach, deceased," etc. This case presents the single question of whether the evidence adduced was sufficient to entitle plaintiff to a

decree of equitable adoption as the adopted daughter of Erich W. Ottersbach. Plaintiff's petition conceded that she was never formally adopted. The title to real estate being involved we have jurisdiction of the appeal. Missouri Constitution, Article V, § 3, V.A.M.S.

Defendant-respondent Mary Ottersbach is the widow of the above mentioned Erich Ottersbach, (who, died March 19, 1951) and is also administratrix of the estate of Erich Ottersbach. Mary Ottersbach married Erich Ottersbach on May 28, 1949. Erich Ottersbach had theretofore married plaintiff's mother, Bertha Hogane, on June 8, 1916, when plaintiff was about ten years of age. Plaintiff's mother, Bertha Hogane Ottersbach died August 21, 1947. Defendant-respondent Dorothy Sandweg (who was born Dorothy Ottersbach) is the half-sister of plaintiff, having been born in March, 1920, of the marriage of Erich Ottersbach and Bertha Hogane Ottersbach. Erich Ottersbach died intestate. Defendants Mary Ottersbach and Dorothy Sandweg now claim the entire estate of Erich Ottersbach, deceased.

Other pertinent facts appearing from the evidence before the chancellor tended to establish: that plaintiff's mother had formerly been married to and divorced from one Lee Hogane; that when plaintiff's mother, then Bertha Hogane, was married to Erich Ottersbach on June 8, 1916, she had two little girls by her former marriage to Lee Hogane; that plaintiff had been born August 8, 1906; and plaintiff's sister, Bernice, had been born in 1908; and that plaintiff's sister, Bernice, died in 1945;

Plaintiff's aunt, Mamie Becke, testified that just prior to the marriage of Erich Ottersbach and plaintiff's mother, Erich had stated to the father of plaintiff's mother that there was no need to be worried about the two little girls (plaintiff and her sister Bernice); that he, Erich Ottersbach, had said of plaintiff and Bernice, "I will raise them as my own"; that "my father was a little worried because he (Erich Ottersbach) was going to take a widow with two children";

That prior to her marriage in 1916 to Erich Ottersbach, plaintiff's mother, plaintiff and plaintiff's sister Bernice had been living with the father of plaintiff's mother in St. Louis; that Erich Ottersbach and plaintiff's mother were married in St. Charles, Missouri, on June 8, 1916, and then, with plaintiff and Bernice, immediately moved into third floor rooms, previously prepared by them for a home, at 8214 North Broadway, St. Louis, and plaintiff and plaintiff's sister Bernice thereafter lived there with them;

That at the time of her mother's marriage to Erich Ottersbach, plaintiff had been attending the Baden School since she became of school age, and in that school was registered under her own name of Gladys Hogane; that plaintiff continued going to the Baden School and was graduated from that grammar school when thirteen years of age; that plaintiff always went by the name of Gladys Hogane and was never known as Gladys Ottersbach; that after plaintiff's graduation from grammar school she went to work for the Busy Bee Candy Company, and thereafter worked for Famous-Barr, and later was employed by the A. & P. Grocery; that plaintiff lived for thirteen years with her mother and Erich Ottersbach, and, until she was twenty-one years of age gave her mother her wages from her employment; that Erich Ottersbach treated his wife's children as his own children, "he treated them good, and brought them up as his own children, treated them just as if they were his own"; that there was "a wonderful companionship between Erich (Ottersbach) and the two little girls"; that he mentioned plaintiff and Bernice as "my girls * * * it was always my girls or the girls, my girls, that was the way he addressed them"; that plaintiff and her sister Bernice usually referred to Erich Ottersbach as "Pop or Dad, either one"; that most of the children who knew Erich called him "Pop"; that Erich Ottersbach "was kind to everybody and he treated them all (including Dorothy) as his daughters and all alike * * * they always seemed to be one happy family"; that even

after plaintiff was employed outside of the home she did the usual things that a daughter would do around the home to help out the family; that plaintiff was treated as a member of the family and there was never any apparent animosity among any of them; that during the ensuing years plaintiff's mother and the three girls attended church together; that Erich never made any observable distinction between Dorothy and plaintiff; that after plaintiff was older she took her half-sister, Dorothy on trips to other states and paid all the expenses of such trips;

That since early childhood plaintiff had been a very close friend of the Kuhs family in St. Louis, and particularly with Ethel Kuhs, a daughter in that family who was about plaintiff's age; that when the Kuhs family moved to a house on Vernoica Street in St. Louis, in 1929, plaintiff went to live with the Kuhs family; that plaintiff and Ethel Kuhs thereafter became closer friends and, in 1940, plaintiff and Ethel Kuhs purchased and moved onto a small farm located on Route 1 near Wentzville, Missouri; that Ethel Kuhs' parents gave $1,000 to Ethel Kuhs and Erich Ottersbach gave to plaintiff a total of $1,000, with which $2,000 Ethel Kuhs and plaintiff built a house on the farm, where they continued to live;

That when plaintiff was baptized on March 19, 1918, the baptismal record showed that her father was Lee Hogane; that when Erich Ottersbach died on March 19, 1951, the newspaper notice of his death prepared by his family stated that he was survived by "his daughters Miss Gladys Hogane and Mrs. Earl Sandweg."

As noted above, the sole question here presented for decision is whether under the evidence the circuit court should have entered a decree of equitable adoption. We must rule that such a decree of equitable adoption would not have been warranted by the evidence before the chancellor in this case.

██ This Court has long held that where a decree of equitable adoption is sought we must examine the evidence with "especial strictness," and that one who seeks to establish an oral contract of adoption or seeks a decree of equitable adoption by estoppel is under "'the burden of producing evidence so clear, cogent and convincing as to leave no reasonable doubt in the chancellor's mind.'" Rich v. Baer, 361 Mo. 1048, 238 S.W.2d 408, 411; Westlake v. Westlake, Mo.Sup., 201 S.W.2d 964; Capps v. Adamson, 362 Mo. 539, 242 S.W.2d 556; Benjamin v. Cronan, 338 Mo. 1177, 93 S.W.2d 975, 979. Notwithstanding that our statutes provide adoption procedure, Sections 453.010 to 453.170 RSMo 1949, V.A.M.S., a court of equity *in a proper case* will decree adoption to protect the interest of a child in a case where one has expressly agreed to adopt such child, or by his acts and conduct has placed himself in a position where it would be inequitable to permit it to be asserted that the child was not adopted. Benjamin v. Cronan, supra. However, equitable adoption will be decreed only where justice, equity and good faith require it. Rich v. Baer, supra.

Plaintiff's instant petition is based upon the oral agreement of Erich Ottersbach "to adopt them, (plaintiff and her sister Bernice) care for, support, educate and maintain them as his own children," etc. But there is no evidence in this record of any agreement to adopt. At the most, the testimony in this transcript shows only that Erich Ottersbach stated to plaintiff's maternal grandfather that, "I will raise them (plaintiff and her sister Bernice Hogane) as my own." The testimony further reflects that plaintiff lived in the home of Erich Ottersbach until she was twenty-three years of age when, in 1929, she moved into the Kuhs home. And it may be conceded from the testimony that during the thirteen years from 1916 to 1929, Erich Ottersbach treated plaintiff well and brought her up as one of his own children. The testimony reflects that Erich referred to plaintiff and Bernice as "my girls" and that they called Erich "Pop" and that plaintiff grew up in a happy family relationship in that home. All in that home seem to

have enjoyed a mutually beneficial family atmosphere free from any animosity and with no observable distinction or discrimination as between plaintiff, Bernice and Dorothy.

The facts noted in the preceding paragraph while significant, fall far short of establishing an oral contract to adopt.

It is asserted in plaintiff's brief that "the acts of all the parties throughout the life of the deceased, Erich W. Ottersbach, show absolutely a contractual relation that embraces all of the elements of equitable adoption, and the respondents herein are precluded from denying the right of the appellant to be a pretermitted heir." It should be here stated that there is no evidence, fact, circumstance or inference even tending to show "a contractual relation that embraces all of the elements of equitable adoption," nor any element of equitable adoption. No agreement or contract to adopt appears anywhere in this case. This record is wholly devoid of either fact or circumstance from which such an agreement could possibly be inferred.

And it is likewise true that no facts appear in this record from which, as plaintiff asserts, "the respondents herein are precluded from denying the right of the appellant to be a pretermitted heir." The facts before the trial chancellor and now before us do not warrant a decree of adoption by estoppel.

In Capps v. Adamson, supra, a case much stronger on the facts than the instant case, we ruled that the evidence did not justify a decree of adoption by estoppel. In the Capps case Edna Bradbury's mother, Mrs. Alice Willets, had married Dr. Adamson when Edna was eight or nine years of age. The family thereafter moved to Arcadia, Kansas. In that case Edna, praying a decree of equitable adoption, proved by "anciently engaged in" [362 Mo. 539, 242 S.W.2d 560], conversations a prenuptial oral agreement by Dr. Adamson to adopt Edna. Dr. Adamson referred to Edna as his "daughter" or his "adopted daughter." Edna took the name "Adamson," and was so enrolled in schools, in Sunday Schools, and was later married under the name of Edna Adamson. Dr. Adamson made Edna the beneficiary of an insurance policy under the name " 'Edna Bradbury, daughter of the Insured' ". Edna grew up in the home and the apparent relationship through the years was that of father and daughter. "He treated her quite as an own father would." We there held, as we must hold here, upon these much weaker instant facts, that "such facts and circumstances are also in harmony and consistent with a step-father-stepdaughter relationship", and that justice, equity, good faith and good conscience do not compel us to rule that the trial chancellor had reached the wrong conclusion upon the evidence before him.

■ While it is true that plaintiff, when about ten years of age, was taken into and grew to young womanhood in Erich Ottersbach's home, that fact together with the other above recited facts are not necessarily consistent only with an agreement to adopt. The instant proof simply does not measure up to the character and quantum of proof that the law requires in cases wherein a decree of equitable adoption is sought. Benjamin v. Cronan, supra; Capps v. Adamson, supra.

Plaintiff cites and relies on such cases as Lynn v. Hockaday, 162 Mo. 111, 124, 61 S.W. 885; Martin v. Martin, 250 Mo. 539, 548, 157 S.W. 575; Drake v. Drake, 328 Mo. 966, 43 S.W.2d 556. We have examined all the cases plaintiff has cited and have concluded they do not rule the facts now before us. The cases relied on by plaintiff were examined and distinguished in Capps v. Adamson, supra, Westlake v. Westlake, supra, Rich v. Baer, supra, and Benjamin v. Cronan, supra. It is unnecessary to here re-state such differences.

■ Plaintiff insistently urges upon us, however, that Lynn v. Hockaday, supra, rules this case. She takes a portion of what we there said out of the context of that opinion and contends that under our ruling in that case if one takes a child into his home to raise "as his own child" and does so, that such fact *alone* is suf-

ficient to constitute adoption by estoppel. We do not agree with plaintiff as to the effect of the Lynn v. Hockaday opinion. That case is distinguishable from this case upon many differences in facts unnecessary to be here stated. The mere fact alone that one takes a child into his home to raise "as his own," and does so, is not of itself sufficient to constitute adoption by estoppel.

These instant facts but exemplify the wisdom of the rule announced in Capps v. Adamson, Westlake v. Westlake, Rich v. Baer, and Benjamin v. Cronan, all supra, and present no exceptional facts whatever which persuade us to depart from the rule of the last four named cases. Justice, equity, good faith and good conscience compel the conclusion that the chancellor entered the correct decee. The decree appealed from is affirmed.

All concur.