**Gladys WOHLGEMUTH, Plaintiff-Appellant,**

**v.**

**Paul S. BROWNING, Executor of the Estate of Samuel D. Browning, Deceased, Paul S. Browning, Individually, and Roy E. Browning, Defendants-Respondents.**

**No. 24011.**

Kansas City Court of Appeals.

Missouri.

Dec. 7, 1964.

---

James J. Wheeler, Keytesville, for appellant.

Don Chapman, Chapman & Chapman, Chillicothe, for respondents.

BROADDUS, Presiding Judge.

This is an appeal from a judgment finding that plaintiff did not have an interest in the probate of the will of Samuel D. Browning and dismissing her petition to contest the same.

Plaintiff's amended petition alleged that, while plaintiff was of tender years, Samuel D. Browning and Laura Browning, his wife, promised and agreed with plaintiff's natural parents that if they would relinquish the control, custody and services of the plaintiff to them Samuel D. Browning and Laura Browning would provide and care for and adopt plaintiff as their child and bring her up and treat her as their child and heir; that plaintiff did make her home with the Brownings as a member of their household, and, during all the time she was in the home, plaintiff worked and assisted in all type of household work and with the housekeeping, cooking, garden work and yard work. The petition alleges the Brownings received the benefits of plaintiff's services and of her love and affection, and the Brownings looked upon plaintiff as their daughter; that plaintiff performed her part of the oral contract of adoption, and gave to the Brownings obedience, love and affection, and treated them as a loving and dutiful daughter; that defendants are estopped to deny the plaintiff is an adopted child of Samuel D. and Laura Browning.

Plaintiff's petition alleges that Laura Browning predeceased her husband Samuel D. Browning; that in July of 1960, a paper writing purporting to be the last will and testament of Samuel D. Browning was presented to the Probate Court of Chariton County; that said paper writing was not the last will and testament of Samuel D. Browning, but was the result of undue influence and executed at a time Samuel D. Browning was not mentally capable of making a will.

The only issue tried was whether or not the plaintiff had such an interest in the probate of the will of Samuel D. Browning as to support an action to contest the will and the trial court found plaintiff "is not the adopted daughter of Samuel D. Browning, deceased, and therefore cannot maintain her action to contest the will of Samuel D. Browning." Plaintiff's petition was then dismissed.

Plaintiff, Gladys Wohlgemuth, was born of the marriage of Jake and Mary Higgins in the year 1912. Her parents were divorced in the same year and her mother was given custody. When plaintiff was about two years old, her mother went to the home

of Samuel D. Browning and his wife, Laura Browning, as a hired girl, where she stayed a short time. The Browning family consisted of two sons, Roy Browning about 12 years old in 1914, and Paul Browning about two and a half years older. When plaintiff's mother left the Brownings, she left plaintiff, then a child of two, with the Brownings as a member of their household, until her maturity and marriage.

Jake Higgins, plaintiff's father, remained in the vicinity of Triplett (a small town near the Browning residence) and worked as a day laborer and wood chopper until 1915, when he went to Iowa. He testified that the Brownings would not let him visit with his daughter when he saw the Brownings in town; that they would pick her up and take her away from him; that on one occasion, he tried to get plaintiff from the Brownings and went to their residence for this purpose; that he was told by Mrs. Browning that he could not come in; that his wife, mother of plaintiff, had given Mrs. Browning the girl and that she, Mrs. Browning, was going to keep her.

Higgins further testified that when plaintiff was about three years old Samuel D. Browning came to his (Higgins) residence in Triplett and asked him to go to Brunswick so that the adoption of plaintiff could be completed; that he did accompany Mr. Browning to Brunswick and to the office of a lawyer, whose name he did not remember; that he had no objection to the adoption and was told by Mr. Browning that arrangements had been made with the mother for the adoption; that the mother was to meet them at the lawyer's office to complete the adoption, but that she did not appear.

Plaintiff made her home with the Brownings from the time she was two years of age until a year after she finished high school. She referred to the Brownings as "Mother" and "Father". She was known by the name of Browning. She did the usual housework in the Browning home, washing dishes, caring for chickens, carrying wood, etc.

Plaintiff was enrolled in grade school under the name of Browning and Mrs. Browning, according to one witness, referred to her as "my girl." Joe Allen, who worked for the Brownings as a hired hand off and on, living in their home, from the time plaintiff was a small child, testified he did not know plaintiff was not a natural child until before the trial.

Plaintiff was enrolled in high school as Gladys Browning. She graduated, as shown by her diploma, as Gladys Mae Browning. The annual school enumeration for the country school district in which the Brownings lived, list Gladys Browning, as a child of Sam Browning for the years 1925, 1926, 1927, 1928, 1929 and 1930. Plaintiff's Exhibits six and seven show that in the census of 1920, plaintiff was enumerated as a daughter and member of the family of Sam D. Browning. She was photographed as a part of the family and, upon the death of Sam Browning, the local newspaper listed plaintiff as a surviving daughter.

Sometime before his death Sam Browning gave to each of his two sons and the plaintiff the sum of $1,000.

Roy Browning testified that he never heard his father say he was going to meet Jake Higgins and was going over to town to get a paper. Paul Browning testified that Jake Higgins never came around his father's home; that his mother never reported to him or to her husband the presence of Jake Higgins on the place; that he never saw Jake Higgins at any time during the time Gladys was living in his father's home. Paul Browning, on being asked if his father ever reported to him about going to Brunswick to get papers on Gladys—his answer was "That is untrue."

Mrs. Viola Feitz, who was a neighbor of the elder Brownings, had known them since 1920. Their farms adjoined. She visited in their home and Mrs. Browning told Gladys that they were not her father and mother. Mrs. Feitz never heard Mr. or Mrs. Browning state that they had adopted Gladys; that she never heard they agreed to adopt her.

Mrs. Geraldine Dickinson testified that Gladys Wohlgemuth went to school to her; that she never heard Mr. or Mrs. Browning say that they had adopted her; that neither Mr. nor Mrs. Browning registered her as Gladys Browning. Mrs. Dickinson testified that Mrs. Browning's reputation for integrity was good.

Lee Browning, a nephew of Samuel Browning never heard Mrs. or Mr. Browning refer to Gladys as their daughter.

Joe Allen, hired man of the Brownings, stated that he never heard the Brownings refer to Gladys as their daughter.

The will of Samuel D. Browning, deceased, designated Paul and Roy Browning as his sons. He mentioned Gladys Wohlgemuth, but did not designate her as his daughter.

Ober Putnam, a brother of Laura Browning, testified that he lived in Indianola, Iowa; that in 1914 their parents (Mr. Putnam's and Mrs. Laura Browning's) lived in Ackworth, Iowa; that Mr. and Mrs. Browning came to visit them; that they brought Gladys with them; that they were curious to know where they got the little girl; that the Brownings said she had been left at their place by her mother; that they were to take care of her and that they had promised to do so for awhile; that they wondered if they would adopt her and the Brownings said no, they had no intention of adopting her; that the boys wouldn't approve of it; that what little money they had left when they died, they wanted to go to the boys.

Ober Putnam further testified that while they were visiting they went up to see a party by the name of Riley Ogan, an old friend of Sam Browning; that they took Gladys with them; that "Riley was curious, same as we were about where they got the girl, and Sam told him the same that he had told us." Ogan said, "Are you aimin' to adopt her?" Sam says, "No, we'll never do that, it wouldn't be fair to the boys."

Ober Putnam further testified that Gladys had been left temporarily with the Brownings by her mother and they promised to take care of her until she came back for her. In response to the question: "Did they call her Gladys Browning?" he said: "They just called her Gladys." He never understood that they gave her the name of Browning, and he never heard her referred to, in the presence of the Brownings, as Gladys Browning.

Mrs. Opal Browning testified that she and Paul Browning were married in 1930; that she asked Mrs. Browning: "Well, if she (Gladys) isn't adopted, why is she going by the name of Browning?" I first asked Mrs. Browning if she was adopted and she said, "No, she isn't adopted." Mrs. Opal Browning then asked the elder Mrs. Browning, "Why does she go by the name of Browning?" She answered by saying, "Well, the neighbors got to calling her Browning because she came here when she was just a child and it just kept going like that, they just let it go." Mrs. Opal Browning further testified that she never heard her father-in-law or her mother-in-law say that they had agreed to adopt Gladys. They said they intended to treat her nice; that when Gladys considered getting married, she heard a conversation between Gladys and Mrs. Laura Browning about Gladys's use of the Browning name. At that time Mr. and Mrs. Browning were in the dining room and Opal and Paul went into the house not knowing there was any discussion on it; that they walked up to the door and Gladys and Mrs. Browning were putting up window blinds and Gladys said: "Ma, I want to use the name of Browning when I get married because Otto insists on it." Mrs. Browning said, "Gladys, we have gone over this so many times. You cannot use the Browning name, it isn't legal; you know you have never been adopted." She testified that Gladys was treated very well.

In January, 1949, Mrs. Browning wrote a memorandum as to the disposition of their

property. The memo is as follows: "January, 1949: Mrs. Laura Browning, Mother of Paul and Roy Browning, after our death, Sam and Laura, divide equal between the Paul and Roy Browning; give Gladys a share of my clothes; let dad have the bed clothes; give Gladys, also, some dishes."

Ben Feitz, a neighbor of the Brownings lived in that neighborhood since 1901. The Brownings moved there a year or so later. He never heard the Brownings say that they agreed to adopt Gladys. Mr. Feitz said that the general reputation of Sam Browning and wife for integrity, honesty and truthfulness was good. He testified that Gladys went by the name of Gladys Browning; that he never heard Sam Browning introduce her as his daughter.

Lavon Browning, son of Roy Browning, testified that he heard his grandmother and grandfather say that Gladys's mother had left her with the Brownings with the idea of coming back for her; that he never heard his grandmother or grandfather say that they had agreed to adopt her.

Miss Katy Putnam, a sister of Mrs. Laura Browning, testified that she was down in Missouri three months before her sister died; that Mrs. Browning had written her about this girl being left there; that she had lost the letter; that Mrs. Browning wrote her that they took the little girl to raise, but didn't adopt her; that Mr. Browning said they had never adopted her; that they never told her they had agreed to adopt her; that they were at the Brownings in 1923 when Gladys was a little girl; that Gladys was treated as a member of the family; that she told Mrs. Browning that she should tell Gladys that she was not their daughter; that soon after that she did tell her—sometime in the summer—"Gladys you are not our daughter"; that Mrs. Browning told Gladys that she should get married under her name of Higgins; that she kept what is known as the Putnam Bible; that it shows the registry of all the Brownings and the Putnams; that it does not show anything about Gladys.

The law governing this case is well settled. As said in the case of Benjamin v. Cronan, 338 Mo. 1177, 93 S.W.2d 975, 979:

"However, the rule is definite and strict as to the requirements respecting the character and quantum of proof necessary to establish an oral contract to adopt or to establish adoption on the theory of estoppel. This rule, as expressed in numerous cases, is that such evidence *must be clear, cogent, and convincing, and such as to leave no reasonable doubt.* Kay v. Neihaus, 298 Mo. 201, loc. cit. 205, 249 S.W. 625; Taylor v. Coberly, 327 Mo. 940, 38 S.W.(2d) 1055, loc. cit. 1060; Gipson v. Owen, 286 Mo. 33, loc. cit. 49, 226 S.W. 856; Ahern v. Matthews, [337] (Mo.Sup.) [362] 85 S.W.(2d) 377, loc. cit. 383. The cases as to this rule are likewise numerous and none to the contrary. In Wales v. Holden, supra, 209 Mo. 552, loc. cit. 558, 108 S.W. 89, 90, it is said: 'The circumstances of this case (for specific performance of alleged oral contract to adopt) forcibly illustrate the wisdom of the rule of evidence so firmly established and so often declared by this court, namely, that the proof to sustain a claim of this kind, in the face of the statute of frauds, must be overwhelmingly in its probative force, leaving no room for a reasonable doubt.' And, as stated in Kinney v. Murray, 170 Mo. 674, loc. cit. 700, 71 S.W. 197, 202, 'there must be no equivocation or uncertainty in the case.' In the present case, as in all such cases, the burden of proof was on plaintiff to establish his case by that character and quantum of proof as required by law. 1 C.J. 1379; Teats v. Flanders, 118 Mo. 660, 24 S.W. 126; McKee v. Higbee, 180 Mo. 263, loc. cit. 304, 79 S.W. 407." (Italics ours)

Not a witness testified that he ever heard either Sam or Laura Browning state that they had adopted plaintiff nor heard them say that they had agreed to adopt her. It is true that plaintiff was left at the home of the Brownings. They fed, clothed and educated her. The court said in the Benjamin case, supra, that the fact that a child is taken into the home at a tender age and recognized and referred to as an adopted child does not necessarily establish adoption of

the child. The court in Hogane v. Ottersbach, 269 S.W.2d 9, Mo.Sup., held that the mere fact alone that one takes a child into his home to raise as his own and does so, is not sufficient to constitute adoption by estoppel.

Plaintiff's brief states that she attended school as a Browning and was held out and married as a Browning and enumerated to the school authorities as a Browning, and that she was listed by the Brownings as their daughter in the census of 1920. She did attend school as a Browning. But there is no evidence that Sam or Laura Browning registered her under that name. Mrs. Dickinson, the school teacher, said neither Mr. nor Mrs. Browning registered her. She was registered as a Browning because she stayed with the Brownings.

There is no evidence that plaintiff was married under the name of Browning. Mrs. Viola Feitz says she *thinks* that plaintiff got married as Gladys Higgins Browning. "I think that is the way it came out in the Brunswick paper." There was substantial evidence to the effect that Laura Browning told plaintiff that she had not been adopted and that she should not use the name of Browning in getting married.

Jake Higgins stated that he went with Sam Browning to a lawyer's office for the purpose of completing the adoption. Sam and Laura Browning are dead—their lips are sealed. However, no member of the Browning family ever heard of it, and Paul Browning said: "It was untrue." The reasonable inference is that if Sam Browning was going to adopt plaintiff and go to a lawyer's office to have the papers made out, he would have taken Mrs. Higgins because she is the one who left the child and the one who was given custody by the court in the divorce proceeding. Apparently, the trial court gave little weight to the testimony of Jake Higgins.

Plaintiff's brief states that when Sam Browning died she was listed in the death notice as his daughter. The exhibit show-

ing this was excluded by the court for the reason that "it is not shown who inserted it—who was the author of it."

The Brownings were people of known integrity in the community and had they agreed to adopt plaintiff it is but reasonable to believe that they would have done so. Stillman v. Austin, 148 S.W.2d 573, 575, Mo. Sup. And a significant fact to be considered is that in the will of Samuel D. Browning the plaintiff was not referred to as a daughter or adopted daughter. See Westlake v. Westlake, 201 S.W.2d 964, 969, Mo.Sup. The will described the defendants, Paul and Roy Browning as "my sons."

 We have reached the conclusion that, under the evidence, plaintiff did not make out a case that measures up to that character and quantum of proof that the law requires in cases of this nature.

The judgment is affirmed.

All concur.