**Robert Lee MIZE, Plaintiff-Respondent,**

**v.**

**Mildred SIMS, Administratrix of the Estate of Charles Otis Petty, Deceased, and Mildred Sims, Individually, Defendants-Appellants.**

**No. 9615.**

Missouri Court of Appeals, Springfield District.

Nov. 2, 1974.

William O. Welman, Welman & Associates, Kennett, for plaintiff-respondent.

William Howard Bloodworth, Bloodworth & Bloodworth, Poplar Bluff, for defendants-appellants.

BILLINGS, Judge.

Equitable adoption proceeding wherein plaintiff Robert Lee Mize was decreed to be the adopted child and lawful heir of Charles Otis Petty, deceased. Mildred Sims, decedent's daughter, individually and as administratrix of her father's estate, has lodged this appeal challenging the sufficiency of the evidence to support the decree. We affirm.

Plaintiff was born the son of Orbert Mize during her marriage to Fred Mize and as near as we can determine was born in 1950 or 1951. Charles O. Petty died in May of 1970 and plaintiff's mother died a few days thereafter. Trial was held in 1973.

Prior to plaintiff's birth Mrs. Mize and her three children lived near the Charles O. Petty farm in the Qulin community of Butler County while her husband was in service. At some undesignated time Mrs. Mize and the three children joined her husband in Texas for an undetermined period of time. Later, Mrs. Mize and the three children returned to Butler County where plaintiff was born approximately two months later. Mrs. Mize thereafter worked as a waitress in the Poplar Bluff area. The record remains silent as to the whereabouts of Fred Mize.

The wife of Charles O. Petty died in 1931. Before her death she was in ill health and Chlola Lilly moved into the Petty home to care for Mrs. Petty and do the housework. Chlola Lilly and her husband had previously lived on the Petty farm but had been separated about a year before she moved into the Petty household. She was living at the Petty home when defendant Mildred Sims was born. Following Mrs. Petty's death Chlola Lilly continued to live with Charles O. Petty until his death and helped rear the defendant, and in due time, the plaintiff.

When the plaintiff was at an age variously described as "four to five months old," "fourteen or fifteen months old," "less than two years old," "four or five years old," his mother delivered him to Charles O. Petty. Plaintiff lived with Charles O. Petty until he reached the age of 17 or 18, "about draft age," at which time he went to the St. Louis area to seek employment. After an undetermined peri-

od working in St. Louis the plaintiff returned to the Charles O. Petty household and did farm work in the Qulin area.

Four witnesses testified on behalf of the plaintiff as to the conduct, acts and admissions on the part of Charles O. Petty concerning an agreement and intent on his part to adopt the plaintiff. Chester Petty, age 60 years, was a nephew and business associate of Charles O. Petty. Aaron Gibbs, 72 years old, and Dudley Hancock, 49 years old, were longtime friends and neighbors of Mr. Petty. Chlola Lilly, age 81 years, was the remaining witness.

The testimony of Chester Petty, Aaron Gibbs and Chlola Lilly clearly indicates that Mrs. Mize literally thrust plaintiff into Charles Petty's custody with this curt explanation: "There he is. He is yours. I can't make a living for him." That Charles O. Petty assumed without objection the responsibilities associated with the rearing of plaintiff may be explained by the fact that Charles O. Petty believed himself to be plaintiff's natural father. He told Chlola Lilly "he surely was his father, he knowed he was." To Chester Petty he said of plaintiff that he "should adopt him," since "he just the same as told me [plaintiff] was his son." In conversations with Aaron Gibbs the decedent said: "Of course, everybody knows that is my boy." And, when plaintiff was about six years of age and neighbor Dudley Hancock inquired of Mr. Petty if he was not too old to be raising a family, Mr. Petty replied that "he was having to raise [plaintiff], he was his own blood."

All of plaintiff's witnesses testified that a father and son relationship existed between Charles O. Petty and the plaintiff. Mr. Petty referred to plaintiff as "Bobby" or "my son," and, was called "daddy" by the plaintiff. Mr. Petty fulfilled the role of a father to plaintiff in all respects, providing training, food, clothing, lodging and education. He took plaintiff to Petty family reunions and other places "to see that Bobby had a good time." Chlola Lilly summarized Mr. Petty's treatment of plaintiff as "just like his own son."

Chlola Lilly also testified that on one occasion Mr. Petty told her "Let's go to Poplar Bluff today and adopt Bobby" but that attempt failed when they arrived at Poplar Bluff and could not locate plaintiff's mother. She said that Mr. Petty told her the reason why he wanted to adopt plaintiff was because "[plaintiff] was his kid." Chester Petty related that he accompanied Mr. Petty to a Poplar Bluff attorney's office "about adoption of Bobby Mize." Mr. Petty told Aaron Gibbs that it was his intention "all along the years" to legally adopt plaintiff but kept putting it off from one time to another and "never did get around to getting papers." Additionally, to Chester Petty, Aaron Gibbs, and Chlola Lilly, Mr. Petty stated he wanted plaintiff to have portions of his property at his death.

With the exception of Mr. Petty's barber, whose testimony added nothing, all of the defendant's witnesses were related by blood or marriage to her. Through these witnesses the defendant sought to show that plaintiff entered the Charles O. Petty household as a part of a babysitting arrangement between plaintiff's mother and Chlola Lilly; that plaintiff was treated no differently than other children who spent some time living in the household; that the relationship between plaintiff and Mr. Petty, as well as that between plaintiff and Chlola Lilly, was marred by fights and bickering and that plaintiff refused to do any work on the farm. Much of the defendant's evidence was directed to the relationship between Mr. Petty and Chlola Lilly and fails to shed any light on the issue of equitable adoption.

 As we have indicated the trial testimony of the witnesses appearing for the parties presented conflicting and wholly inconsistent versions of the circumstances surrounding plaintiff's arrival and stay with Charles Petty. Specific findings of fact were not requested, therefore all

fact issues are deemed to have been found in accordance with the court's decree. Rule 73.01(b), V.A.M.R. Nevertheless, since this is an equity case in our review we consider the evidence de novo upon the record properly before us [Long v. Willey, 391 S.W.2d 301 (Mo.1965); Lukas v. Hays, 283 S.W.2d 561 (Mo.1955)] and "[W]hen an issue of fact has been decided by the chancellor upon conflicting evidence, and such finding turns upon the testimony of witnesses who have appeared before him, such finding will be sustained unless clearly erroneous." Long v. Willey, supra, 391 S.W.2d at 305; Rule 73.01(d), V.A.M.R.; McCormick v. Johnson, 441 S.W.2d 724 (Mo.App.1969). And, deference is to be accorded to the superior opportunity of the trial judge to determine the credibility of the witnesses who appeared before him. Long v. Willey, supra; Nutz v. Shepherd, 490 S.W.2d 366 (Mo.App.1973).

■ "Equitable adoption in this state is founded upon well established equitable principles by which equity may grant specific enforcement of a contract to adopt, or declare, in a proper case, that a defendant is estopped to deny the adoption agreed to be made." Menees v. Cowgill, 359 Mo. 697, 706, 223 S.W.2d 412, 416 (1949), cert. den. 338 U.S. 949, 70 S.Ct. 488, 94 L.Ed. 585 (1950). *To warrant a decree of equitable adoption, it is not indispensable that a contract to adopt be shown by direct evidence, rather such an agreement may be inferred from the acts, conduct, and admissions of the adopting parent.* Lukas v. Hays, supra, 283 S.W.2d at 566; Drake v. Drake, 328 Mo. 966, 43 S.W.2d 556 (banc 1931); Taylor v. Coberly, 327 Mo. 940, 38 S.W.2d 1055 (1931); Johnson v. Antry, 5 S.W.2d 405 (Mo.1928); Kay v. Niehaus, 298 Mo. 201, 249 S.W. 625 (1923). "If, therefore, the statements, admissions, and conduct of the adopting parent 'are such as to furnish clear and satisfactory proof that an agreement of adoption must have existed, then the agreement may be found as an inference from that evidence.'" Bland v.

Buoy, 335 Mo. 967, 983, 74 S.W.2d 612, 620 (1934).

■ Furthermore, "Where one takes a child into his home *as his own,* thereby voluntarily assuming the *status of parent,* and by reason thereof obtains from the child the love, affection, companionship, and services which ordinarily accrue to a parent, he is thereafter estopped to assert that he did not adopt the child in the manner provided by law" [Shelp v. Mercantile Trust Co., 322 Mo. 682, 694–695, 15 S.W.2d 818, 824 (1929); Weber v. Griffiths, 349 Mo. 145, 159 S.W.2d 670 (1941); Taylor v. Coberly, supra, 38 S.W.2d at 1062; Holloway v. Jones, 246 S.W. 587 (Mo.1922)], provided that "justice, equity and good faith" compel a decree of equitable adoption. Rich v. Baer, 361 Mo. 1048, 1056, 238 S.W.2d 408, 413 (1951); Hegger v. Kausler, 303 S.W.2d 81 (Mo.1957); Hogane v. Ottersbach, 269 S.W.2d 9 (Mo. 1954); see also Menees v. Cowgill, supra, 223 S.W.2d at 417. One who seeks a decree of equitable adoption has the onerous task of producing evidence so clear, cogent, and convincing as to leave no reasonable doubt in the chancellor's mind. Lukas v. Hays, supra, 283 S.W.2d at 566; Hogane v. Ottersbach, supra, 269 S.W.2d at 11; Capps v. Adamson, 362 Mo. 539, 544, 242 S.W.2d 556, 559 (1951); Rich v. Baer, supra, 238 S.W.2d at 411; Benjamin v. Cronan, 338 Mo. 1177, 1185, 93 S.W.2d 975, 979 (1936).

■ The issue before us is whether the acts, conduct and admissions of Charles O. Petty are such as to compel the conclusion that plaintiff had acquired the status of adopted child during Petty's lifetime. In determining the sufficiency of the evidence to support equitable adoption, each case is to be decided on its own peculiar facts. Hegger v. Kausler, supra, 303 S.W.2d at 81; Lukas v. Hays, supra, 283 S.W.2d at 561.

■ As in all cases of equitable adoption, formal adoption was not effected by

the adoptive parent in the manner contemplated by law. However, Charles O. Petty was a man of great informality. His business dealings were mainly oral. His long relationship with Chlola Lilly was uncommemorated by marriage despite his expressed intention to so commemorate it. Although mentioned at times, he never bothered to execute a last will and testament. "I hate to go into anything where I don't know anything about papers or anything like that," he once told Aaron Gibbs. His farming arrangements with Chester Petty over the years were not carried out by written agreements. "[I]t was always just his word for everything." Thus, his failure to formally adopt plaintiff is entirely consistent with the existence of an agreement to adopt. Compare Stillman v. Austin, 148 S.W.2d 573, 575 (Mo. 1941) and Wohlgemuth v. Browning, 384 S.W.2d 820, 825 (Mo.App.1964) where the character of the putative adopting parents was such "had they agreed to adopt plaintiff it is but reasonable to believe that they would have done so."

In our view the acts, conduct and admissions of Charles O. Petty clearly and cogently delineate an agreement to adopt plaintiff. He believed himself to be plaintiff's natural father. He readily admitted that he intended "all along the years" to adopt plaintiff. He accepted from plaintiff's mother the full and exclusive responsibility to rear and educate plaintiff and he desired plaintiff to take part of his property when he died. Except for effecting formal adoption, the agreement was fully performed by both Mr. Petty and plaintiff. Mr. Petty took plaintiff into his home and performed all duties toward plaintiff which he would have performed toward a natural son in his own household and, indeed, he believed plaintiff to be his natural son. He voluntarily assumed the status of parent toward plaintiff. As for his part, plaintiff stayed in the intestate's household

from infancy to the age of 17 or 18 and "[h]e knew he was a Petty." During that time Mr. Petty obtained the love, affection, companionship and services which ordinarily accrue to a parent. "[B]y his acts and conduct [Mr. Petty] has placed himself in a position where it would be inequitable to permit it to be asserted that the child was not adopted." Hogane v. Ottersbach, supra, 269 S.W.2d at 11.

While it is true Mr. Petty frequently took orphaned or abandoned children into his home, his treatment of plaintiff was in marked contrast to that of the others. The other children were generally older and stayed in his household for short, intermittent periods of time. He never spoke of the others as his own, or that he wanted to adopt them or have them share in his estate.[1]

In the instant case, the exceptional treatment given plaintiff, when compared with that given other children that spent time in the Petty household, is further evidence indicating an agreement that plaintiff would be adopted.

When plaintiff left the home of Mr. Petty at the age of 17 or 18 to seek employment, the inference is that the going was agreeable to all concerned. Benjamin v. Cronan, supra, 93 S.W.2d at 980. As already referred to herein, through her witnesses defendant sought to show an estrangement between plaintiff and Mr. Petty. In view of Chlola Lilly's testimony on behalf of plaintiff, it appears that defendant's witnesses have magnified whatever disagreements which did exist, and which exist in all families, all out of proportion. Furthermore, we are not cited to any authority which stands for the proposition that once there has been full performance of an agreement to adopt by both the adopting father and the adopted son, a court of equity would deny affirmative relief solely because the father and son sub-

---

1. Compare Drake v. Drake, supra, 43 S.W.2d at 556 where the special treatment given by a stepfather to his stepson, in contrast to that given three stepdaughters, indicated a general understanding that the stepson would be adopted.

sequently become estranged. See Remmers v. Remmers, 239 S.W. 509 (Mo.1922); Dillmann v. Davison, 239 S.W. 505 (Mo. 1922); Rauch v. Metz, 212 S.W. 357 (Mo. banc 1919).

The record leaves little doubt that plaintiff's mother relinquished complete control and sustenance of her son to Charles O. Petty. Except for occasional visits over the years and a few gifts, the maternal ties of Mrs. Mize and her son were severed when plaintiff entered the Charles O. Petty household. As Chester Petty put it: "The boy's mother never paid him no mind;" "Bobby Mize's mother didn't even recognize him as her son."

The case at bar is similar on its facts to the case of McCary v. McCary, 239 S.W. 848 (Mo.1922). In that case a mother surrendered custody of her illegitimate child to his self-admitted natural father when the child was old enough to dispense with her care. Thereafter, the father retained the exclusive control of the child, he gave it his name,[2] and he performed all duties required and expected of a father. Said the court, "Whatever the words in which it [the agreement with the mother] was expressed, they were made plain and unmistakable by his conduct in the performance of his undertaking, which covered so far as it was possible to cover, full reparation for his wrong to the child and for the sacrifice of the mother in surrendering it to his custody. While the arrangement was with the mother, it was by its terms to inure, and did inure, solely to the benefit of the plaintiff. It was fully performed by the parties, during the lifetime of the father, and the status of son which it created, with all its incidents and obligations, had become fully vested." 239 S.W. at 850.

This court need not speculate as to plaintiff's actual parentage. Mr. Petty's belief that he was plaintiff's natural father provides insight as to the meaning of his conduct toward plaintiff. By his adoption of plaintiff he would atone for his indiscretion much in the same manner as the father of McCary offered reparation for his wrong to the child involved in that case.

■ Defendant intimates that an essential element of equitable adoption is that the agreement of the adopting parent be communicated to the child so that the child can act in reliance on the agreement. But as McCary indicates, a child's love, affection, companionship and service need not be given in response to an offer to adopt communicated to him, as is contended for by defendant without citation of authority. "Equity acts to protect the child," and equitable adoption is not based upon direct communication to the child but rather upon the ground that it is " '. . . inequitable and unjust to allow one to fail to comply with an agreement made with the parent or custodian of a child to adopt it, when he has taken the child at such an age that it had no will or choice in the matter, that, after the child has performed everything contemplated by the relation provided for, the intended adoptive parent or his heirs will be estopped to deny the adoption.' " Rumans v. Lighthizer, 363 Mo. 125, 249 S.W.2d 397, 400–401 (1952). See also Thompson v. Moseley, 344 Mo. 240, 125 S.W.2d 860 (1939). We do not cast a burden upon a child of tender age to remember events beyond his little comprehension.

■ We have already noted that because each case has its own peculiar facts, precedent is of little value in determining the sufficiency of the evidence to support a decree of equitable adoption. Furthermore, each of the cases cited by defendant,

2. Although the instant plaintiff's name was not changed to that of Petty we note that a case for equitable adoption does not require a change in the child's name. Ahern v. Matthews, 337 Mo. 362, 85 S.W.2d 377 (1935); Holloway v. Jones, supra, 246 S.W. at 591; Craddock v. Jackson, 223 S.W. 924 (Mo.1920); Signaigo v. Signaigo, 205 S.W. 23 (Mo. banc 1918).

although presenting fact situations in which the argument for equitable adoption was unpersuasive, are clearly distinguishable from the case at bar. In Hegger v. Kausler, supra, 303 S.W.2d at 81, the putative parents, acting in accordance with a common practice of rearing children of deceased relatives, had cared for their parentless niece in the capacity of aunt and uncle. In both Capps v. Adamson, supra, 242 S.W.2d at 556 and Hogane v. Ottersbach, supra, 269 S.W.2d at 9, the facts urged to prove a father-daughter relation were equally consistent with that of stepfather-stepdaughter. In Rich v. Baer, supra, 238 S.W.2d at 413, the court reflected on repeated acts of generosity of the reputed parents during their lifetime toward a child placed in their care by *court order* and concluded that the "facts do not present a situation where justice, equity and good faith compel a decree" of equitable adoption. In Benjamin v. Cronan, supra, 93 S.W.2d at 975, the alleged adopting parents refused to sign a deed of adoption, entered into a contract with an orphanage which was inconsistent with any intent to adopt, and legally adopted *another child* at about the same time that they acquired the custody of the child whose status was in issue. Finally, Wohlgemuth v. Browning, supra, 384 S.W.2d at 820, involved a will contest in which the plaintiff was a would-be contestant of a will. In that case the will referred parenthetically to the testator's sons, as such, with no such comparable reference following the plaintiff's name and there was substantial evidence that the testator had intended to *not* adopt plaintiff since "it wouldn't be fair to the boys."

We also find some similarity between the facts and circumstances in this case and that of Holloway v. Jones, supra, 246 S.W. at 587. In the *Holloway* case Minnie had been placed in the McHaney home by her parents when she was of pre-school age. There was evidence that Minnie had been given completely to the McHaney's by her father; that the McHaney's performed all of the acts which parents would be expected to perform for a child, and, conversely, Minnie had performed all the duties which would be expected of a child toward its parents.

As in *Holloway* the claim here is simply that at the time of the death of Mr. Petty the plaintiff was, in equity, his adopted child. In *Holloway* the court said [246 S.W. at 590–591]:

"For the purposes of this case it matters little whether we regard the act of adoption as a status voluntarily assumed with the parental duties and burdens imposed by the statute with the corresponding benefits inuring to the adopted child . . . or as a contract of which the child is the beneficiary; their respective rights, obligations, and duties are the same, and these have been enforced in equity by the courts of this state in numerous cases . . . [citations omitted]. In all these cases it is held, in substance, that one who takes a child into his home as his own, receiving the benefits accruing to him on account of that relation, assumes the duties and burdens incident thereto, and that where justice and good faith require it the court will enforce the rights incident to the statutory relation of adoption. The child having performed all the duties pertaining to that relation, the adopting parent will be estopped in equity from denying that he assumed the corresponding obligation. . . . [T]his court has consistently held that he who has taken possession of a child in the capacity of an adopting parent cannot escape the duties and liabilities incident to that capacity by failing to follow the forms that the statute has prescribed to that end. It is not contemplated, although he may do so, that he should confer his name upon the child because the law has . . . created a distinct, different, and additional proceeding for that purpose. . . . [I]t is unnecessary that the words 'adopt' should be used in connection with the incurring of such liability, and the maintenance of the relation may of itself

be sufficient evidence, in equity, upon which to rest the resulting obligations."

We are of the opinion that the evidence is sufficiently clear, cogent and convincing that plaintiff attained the status of an adopted child of Charles O. Petty during the latter's lifetime and that it would be inequitable to permit it to be asserted that plaintiff was not so adopted.

The judgment is affirmed.

HOGAN, C. J., and TITUS and FLANIGAN, JJ., concur.

STONE, J., not sitting.